988 So.2d 186 (2008)
Joseph SHER
v.
LAFAYETTE INSURANCE COMPANY; United Fire & Casualty Company; The United Fire Group; Robert Jones; Wes Swank; Fred Vanderbrook; and Property Loss Consulting, Inc.
Nos. 2007-C-2441, 2007-C-2443.
Supreme Court of Louisiana.
April 8, 2008.
Opinion on Rehearing July 7, 2008.
*189 Bernard, Cassisa, Elliott & Davis, Robert A. McMahon, Jr., Howard Bruce Kaplan, William Daniel O'Regan, IV, Metairie, Lugenbuhl, Wheaton, Peck, Rankin & Hubbard, Ralph Shelton Hubbard, III, New Orleans, for Applicant (2007-C-2441) and Respondent (2007-C-2443).
Sher, Garner, Cahill, Richter, Klein & Hilbert, James Michael Garner, Darnell Bludworth, Timothy Benedict Francis, Lauren Leigh Lagarde Hudson, Ellen Pavich *190 Dunbar, The Dudenhefer Law Firm, Frank C. Dudenhefer, Jr., New Orleans, for Respondent (2007-C-2441) and Applicant (2007-C-2443).
Edward Dirk Wegmann, New Orleans, Robert H. Shulman, Washington, DC, Harry Simms Hardin, III, Madeleine Fischer, Joseph J. Lowenthal, Jr., New Orleans, for Tulane Educational Fund Administrators, Amicus Curiae.
Wystan M. Ackerman, Hartford, CT, Kevin Eugene Thomas Cunningham, Baton Rouge, Stephen E. Goldman, Hartford, CT, for American Insurance Association, Amicus Curiae.
Stephen G. Bullock, Mary L. Dumestre, Andrea Leigh Fannin, Wayne Joseph Lee, Charles Louis Chassaignac, IV, New Orleans, William Ryan Acomb, for National Association of Mutual Insurance Company, Amicus Curiae.
Kevin Michael McGlone, James Michael Garner, Timothy Benedict Francis, Darnell Bludworth, New Orleans, for Xavier University of Louisiana, Amicus Curiae.
James D. Caldwell, Tallulah, for State of Louisiana, Amicus Curiae.
Richard J. Doren, Los Angeles, CA, Robert Irwin Siegel, New Orleans, James C. Ho, Dallas, TX, Daniel W. Nelson, for Lexington Insurance Company, Amicus Curiae.
Francis X. Neuner, Jr., Lafayette, for Property Casualty Insurers Association of America and Louisiana Association of Business and Industry, Amicus Curiae.
John W. Waters, Jr., Gregory John McDonald, New Orleans, Amy Bach, Mill Valley, CA, for Louisiana Citizens Property Insurance Company, Amicus Curiae.
Sean Patrick Mount, Daniel Michael Redmann, Dominic J. Ovella, Metairie, for Fidelity and Deposit Company of Maryland, Empire Fire and Marine Insurance Company, Empire Indemnity Insurance Company and Centre Insurance Company, Amicus Curiae.
Amy Bach, Mill Valley, CA, William F. Merlin, Jr., Deborah R. Totter, Mary Kestenbaum, Tampa, FL, for United Policyholders, Amicus Curiae.
Adrianne L. Baumgartner, Covington, for National Association of Mutual Insurance Companies, Amicus Curiae.
James McClendon Williams, John William Houghtaling, III, Metairie, for Gauthier Houghtaling & Williams LLP, Amicus Curiae.
Kevin Michael McGlone, Darnell Bludworth, James Michael Garner, New Orleans, for Imperial Trading Co., Inc., Amicus Curiae.
Larry Dewayne Dyess, for Glen Philips and Deborah Philips, Amicus Curiae.
Larry Dewayne Dyess, Darin McMullen, Philadelphia, PA, J.J. McKernan, Drew Averill Rainer, James Parkerson Roy, Lafayette, Norval Francis Elliot, III, Calvin Clifford Fayard, Jr., Denham Springs, John N. Ellison, Matthew D. Schultz, for Chehardy Representative Policyholders, Amicus Curiae.
Joseph Edward Cain, New Orleans, Michael Ryan Casey, Bruce Campbell Dean, Metairie, Soren Erik Gisleson, Russ Michel Herman, Stephen Jay Herman, Cynthia Green St. Amant, Allan Kanner, New Orleans, for Louisiana Association for Justice, Amicus Curiae.
TRAYLOR, Justice.[*]
We granted these consolidated writ applications in order to determine whether *191 the courts below erred. For the reasons which follow, we affirm in part, reverse in part, and render judgment.

FACTS and PROCEDURAL HISTORY
On August 29, 2005, Hurricane Katrina struck New Orleans and the surrounding area with devastating results. As a result of the storm, extremely high water attacked the levee system protecting the city, causing some of the levees to fail and inundating the majority of the city with water.
Joseph Sher, the plaintiff, owned and lived in a five-unit apartment building in New Orleans at 1410 Broadway Street. Mr. Sher did not evacuate prior to the storm and was subsequently trapped by the flood waters, which reached a level of four feet in the lower level of the building. After his evacuation, plaintiff traveled to Baton Rouge and resided with one of his children.
Plaintiff had obtained a commercial all-risk insurance policy covering the building from Lafayette Insurance Company in 1989, which coverage was in effect throughout the time period in question. After the hurricane, plaintiff inspected his property and informed Lafayette of his claim. Lafayette assigned the claim to Property Loss Consulting, Inc. (PLC), on October 5, 2005, and Robert Jones conducted an inspection of the building on November 1, 2005. Following the inspection, Lafayette determined that most of the building's damage was due to poor maintenance, disrepair, and flooding, and estimated plaintiff's damages as $3,307.09. After subtracting a hurricane deductible of $1,000 and a premium charge of $2,037, Lafayette issued plaintiff a check in the amount of $270.09.
After a second inspection of the premises by Fred Vanderbrook, a consulting engineer hired by Lafayette, Lafayette issued plaintiff another check in the amount of $2,484.99. Plaintiff did not negotiate either check.
After continuously disputing Lafayette's damage estimate and sending Lafayette additional estimates and repair invoices, plaintiff filed suit on August 28, 2006 against Lafayette, United Fire and Casualty Company (UFCC), United Fire Group (UFG), Robert Jones, Wes Swank, Fred Vanderbrook, and PLC in Civil District Court in Orleans Parish. Plaintiff's petition included claims for insurance coverage, bad faith penalties, attorney's fees and costs, and bad faith breach of insurance contract. Lafayette answered asserting the declinatory exception of lis pendens, which exception was dismissed. UFCC and UFG filed motions for summary judgment, asserting that they were not liable to plaintiff. Plaintiff dismissed UFCC and UFG without prejudice. Vanderbrook filed an exception of vagueness and/or ambiguity, after which plaintiff dismissed him without prejudice.
Lafayette filed a motion for leave to file third party demands against the Federal Emergency Management Agency and the National Flood Insurance Program, which the trial court denied due to time constraints.
Plaintiff filed a motion for partial summary judgment, asking that the flood exclusion in Lafayette's policy be declared ambiguous. The trial court granted the motion for partial summary judgment, ruling that the flood exclusion was ambiguous, and that the policy covered man-made events.
Lafayette filed a motion in limine to exclude new theories of recovery not disclosed prior to trial, which the trial court granted. Plaintiff filed a motion in limine to exclude limitations or exclusions not specifically pled in Lafayette's answer as affirmative defenses, which the trial court *192 granted. Lafayette then filed a motion in limine to exclude prejudicial statements, including a statement that plaintiff was a Holocaust survivor. The trial court denied the motion as to mention of the Holocaust on a limited basis.
The trial was conducted in two phases over five days, the first phase concerning liability and damages, and the second concerning only Lafayette's alleged arbitrary and capricious behavior. The jury returned a verdict against Lafayette and awarded the following damages:

Building Damage Above the Basement $175,850.00
Building Damage In the Basement 144,300.00
Lost Rents 17,350.00
Business Personal Property 31,577.00
Penalties Pursuant to R.S. 22:658 184,538.50
 ___________
TOTAL $553,615.50

Following the trial, plaintiff dismissed his claims, with a reservation of rights, against Robert Jones, Wes Swank, and PLC. The trial court assessed attorney's fees and costs as follows:

Costs Pursuant to C.C.P. art. 1920 $ 16,288.60
Costs Pursuant to C.C.P. art. 970 42,020.24
Attorney's Fees Pursuant to C.C. art. 1997
 and/or R.S. 22:658 258,728.00
 ___________
TOTAL $317,036.84

The total judgment against Lafayette, including attorney's fees and costs assessed by the trial judge, totaled $870,652.34.
Lafayette filed a suspensive appeal asserting several claims of error, which plaintiff answered, asserting his own claims of error. The court of appeal amended in part, affirmed and rendered as amended. The awards as amended by the court of appeal are as follows:

Building Damage Above the Basement $175,850.00
Building Damage In the Basement 144,300.00
Lost Rents 17,350.00
Business Personal Property 31,577.00
Penalties Pursuant to R.S. 22:658 92,269.25
 ___________
TOTAL $461,346.25
Costs Pursuant to C.C.P. art. 1920 $ 16,288.60
Costs Pursuant to C.C.P. art. 970 42,020.24
Attorney's Fees Pursuant to C.C. art. 1997
 and/or R.S. 22:658 0.00
 ___________
TOTAL $ 53,308.84

The total award as amended and rendered by the court of appeal is $514,655.09.

DISCUSSION

Partial Summary Judgment
Lafayette argues that the court of appeal erred in affirming the trial court's granting of plaintiff's partial motion for summary judgment by determining that the meaning of the word "flood," as used in the policy, was ambiguous. We agree.
We recently discussed the law applicable to review of a grant or denial of a motion for summary judgment, and to the proper interpretation of an insurance policy, in Huggins v. Gerry Lane Enterprises, Inc., 2006-2816 (La.5/22/07), 957 So.2d 127, 128-9.
A motion for summary judgment will be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to material fact and that mover is entitled to judgment as a matter of law." This court reviews a grant or denial of a motion for summary judgment de novo. Thus, this court asks the same questions as does the trial court in determining whether summary judgment is appropriate: whether there is any genuine issue of material fact, and whether the mover is entitled to judgment as a matter of law.
Interpretation of an insurance policy usually involves a legal question which can be resolved properly in the framework of a motion for summary judgment. An insurance policy is a contract between the parties and should be construed using the general rules of interpretation of contracts set forth in the Civil Code. The judicial responsibility in interpreting insurance contracts is to determine the parties' common intent. *193 Words and phrases used in an insurance policy are to be construed using their plain, ordinary and generally prevailing meaning, unless the words have acquired a technical meaning.
An insurance policy should not be interpreted in an unreasonable or a strained manner so as to enlarge or to restrict its provisions beyond what is reasonably contemplated by its terms or so as to achieve an absurd conclusion. Unless a policy conflicts with statutory provisions or public policy, it may limit an insurer's liability and impose and enforce reasonable conditions upon the policy obligations the insurer contractually assumes.
If after applying the other general rules of construction an ambiguity remains, the ambiguous contractual provision is to be construed against the insurer and in favor of coverage. Under this rule of strict construction, equivocal provisions seeking to narrow an insurer's obligation are strictly construed against the insurer. That strict construction principle, however, is subject to exceptions. One of these exceptions is that the strict construction rule applies only if the ambiguous policy provision is susceptible to two or more reasonable interpretations. For the rule of strict construction to apply, the insurance policy must be not only susceptible to two or more interpretations, but each of the alternative interpretations must be reasonable. (Citations omitted).
Huggins, 957 So.2d at 128-9.
Here, both the trial court and the court of appeal found that the word "flood" in the water exclusion of the policy was susceptible to multiple definitions and therefore ambiguous. As a result, both courts construed the policy against Lafayette, finding coverage for damages caused by the four feet of water which inundated the lower floor of plaintiff's property.
The exclusion at issue reads in pertinent part as follows:
B. EXCLUSIONS
1. We will not pay for loss or damage caused directly or indirectly by any of the following. Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss.
* * *
g. Water
(1) Flood, surface water, waves, tides, tidal waves, overflow of any body of water, or their spray, all whether driven by wind or not;
(2) Mudslide or mudflow;
(3) Water that backs up from a sewer or drain; or
(4) Water under the ground surface pressing on, or flowing or seeping through:
(a) Foundations, walls, floors or paved surfaces;
(b) Basements, whether paved or not; or
(c) Doors, windows or other openings.
The term "flood" is not defined in the policy. In such a case, the word should, as stated above, be given its plain, ordinary and generally prevailing meaning. C.C. art. 2047. Although the court of appeal recognized this rule of construction, it found that because there were varying causes of floods, the word "flood," itself, was ambiguous. The court of appeal then proceeded to construe the exception against Lafayette and in favor of plaintiff, finding that the policy did, indeed, provide flood coverage for the plaintiff. In support of its reasoning, the court of appeal *194 pointed out that the "exclusion includes `flood,' but then continued to list specific natural disasters that cause inundations of water, commonly labeled as `floods,'" such as waves, tides, tidal waves and the overflow of water, whether driven by wind or not. Sher, 973 So.2d at 51.
The plain, ordinary and generally prevailing meaning of the word "flood" is the overflow of a body of water causing a large amount of water to cover an area that is usually dry. This definition does not depend on locality, culture, or even national origin  the entire English speaking world recognizes that a flood is the overflow of a body of water causing a large amount of water to cover an area that is usually dry land.[1] Contrary to the court of appeal's reasoning, this definition does not change or depend on whether the event is a natural disaster or a man-made one  in either case, a large amount of water covers an area that is usually dry. The plain, ordinary and generally prevailing meaning is all-inclusive. Further, of the examples of high water contained in the exclusion and described by the court of appeal as "natural disasters," only one, tides, is exclusively natural  waves, tidal waves, and the overflow of water may be either natural or man-made,[2] as may be "floods." Far from supporting the court of appeal's conclusion that the term "flood" is ambiguous because it does not distinguish between man-made and natural flood, this tends to show that the parties intended the word "flood," to have its plain, ordinary and generally prevailing meaning  the overflow of a body of water causing a large amount of water to cover an area that is usually dry  regardless of its cause.
The court of appeal's reasoning was likewise flawed when, because it had found the word "flood" ambiguous, it construed the policy against the insurer, finding coverage for the flood damage to the basement of plaintiff's building. As stated above, when there is an ambiguity in a policy of insurance, the ambiguity should be construed in favor of coverage, but only if the ambiguous policy provision is susceptible to two or more reasonable interpretations. The court of appeal did not definitively state what were the two or more reasonable interpretations it found of the word "flood." We assume that one "reasonable interpretation" of the word would be its plain, ordinary and generally prevailing meaning  the overflow of a body of water causing a large amount of water to cover an area that is usually dry, including both man-made and natural disasters.[3] Applying this meaning to the word "flood" in the exclusion would be entirely reasonable, as "flood" is used in the exclusion without modifier and along with other terms which are likewise susceptible to being caused by man or nature. We further assume that the other interpretation of the word "flood" found "reasonable" *195 by the court of appeal would be a flood which is entirely natural. Because there is no indication within the four corners of the insurance contract that the parties intended to use such a restrictive definition of the word "flood," and because such a definition is not the plain, ordinary and generally prevailing meaning of the word, the use of that definition is per se unreasonable. In other words, to fail to give the generally prevailing common meaning to a term in an insurance contract, when the use of that meaning would be perfectly reasonable, in favor of a more restrictive meaning, is without justification, and appears to be more result determinative than legally warranted. Furthermore, use of the restrictive definition would lead to absurd results. Using the court of appeal's definition, a homeowner whose house is located outside a protective levee would be excluded from recovering flood damages to his property, while a homeowner whose house is located inside the levee system would be able to recover under the same policy for the same flood water simply because it flowed through a breach in the levee.
Finally, even if the exclusion only referred to natural, rather than man-made, floods, the flood at issue was not caused by man. The flood was caused by Hurricane Katrina, not by man. The levees did not cause the flood, they, whether through faulty design, faulty construction, or some other reason, failed to prevent the flood.
Our conclusion in this regard is supported by a similar analysis by the Colorado Supreme Court. There, after a dam broke causing a man-made lake to flood their property, the plaintiffs argued that the flood exclusion in their insurance policy was ambiguous, in that the policy did not distinguish between man-made and natural floods. In its analysis, the Colorado Supreme Court said:
Mere disagreement between the parties about the meaning of a term does not create ambiguity. In ascertaining whether certain provisions of a document are ambiguous, the instrument's language must be examined and construed in harmony with the plain and generally accepted meaning of the words employed, and reference must be made to all the provisions of the agreement.
The generally accepted meaning of the term "flood" does not include a distinction between artificial and natural floods. For example, Webster's New World Dictionary 535 (2d ed.1974), defines "flood" as: "[A]n overflowing of water on an area normally dry; inundation; deluge ..." Webster's Ninth New Collegiate Dictionary 474 (9th ed.1988), defines the term as: "[A] rising and overflowing of a body of water esp[ecially] onto normally dry land ..." Black's Law Dictionary (5th ed.1979), contains a similar definition: "An inundation of water over land not usually covered by it. Water which inundates area of surface of earth where it ordinarily would not be expected to be." The inundation of insureds' normally dry land fall squarely within these generally accepted definitions of the term "flood."
* * *
Here ... there is no basis for holding that the term "flood" is ambiguous as applied to "the great overflowing of water" caused by the failure of the Lawn Lake Dam. That is, when this exclusion is construed in harmony with the generally accepted meaning of the term "flood" and in the context of the facts of this case, there is no doubt that this large-scale inundation of water was a "flood."

*196 * * *
In interpreting insurance contracts, courts are not at liberty to raise doubts where there are none or to make a new contract between the insured and the insurer.
We decline to force an ambiguity where the meaning of the term "flood" is clear in the context of the facts of this case. (Citations omitted).
Kane v. Royal Ins. Co. of America, 768 P.2d 678 (Colo.1989).
Likewise, our analysis is supported by that of the United States Fifth Circuit Court of Appeals. In a suit resulting from the failure of levees along canals in New Orleans following Hurricane Katrina, the federal court stated:
In light of these definitions, we conclude that the flood exclusions are unambiguous in the context of this case and that what occurred here fits squarely within the generally prevailing meaning of the term "flood." When a body of water overflows its normal boundaries and inundates an area of land that is normally dry, the event is a flood. This is precisely what happened in New Orleans in the aftermath of Hurricane Katrina. Three watercourses ... overflowed their normal channels, and the levees built alongside the canals to hold back their floodwaters failed to do so. As a result, an enormous volume of water inundated the city. In common parlance, this event is known as a flood.
Additionally, a levee is a flood-control structure; its very purpose is to prevent the floodwaters from overflowing onto certain land areas, i.e., to prevent floods from becoming more widespread. By definition, whenever a levee ruptures and fails to hold back floodwaters, the result is a more widespread flood. That a levee's failure is due to its negligent design, construction, or maintenance does not change the character of the water escaping through the levee's breach; the waters are still floodwaters, and the result is a flood.
In re Katrina Canal Breaches Litigation, 495 F.3d 191, 214 (5th Cir.2007).
Because the use of the plain, ordinary and generally prevailing meaning of the word "flood" in the exclusion is reasonable and does not conflict with any statutory provision or public policy, Lafayette is entitled, through use of the term "flood", to limit its own liability and impose and enforce such reasonable conditions upon the policy obligations that the insurer has contractually assumed.
In his testimony as to damage to the building, plaintiff's architectural expert testified that the basement repairs would include "[d]emolition, gutting, and cleanup" due to the standing water. R., Vol. XVII at 94. The expert further testified that the standing flood water caused corroded fasteners, expanded and shrinking wood, split members in the framing system. R., Vol. XVII at 109. Based on plaintiff's architectural expert's testimony, the damage to the lower level of plaintiff's building was caused entirely by excluded flood damage.

Plaintiff's Claims of Error

Penalties and Attorney's Fees under R.S. 22:658
Plaintiff contends that the court of appeal erred in holding that Lafayette was liable under the version of R.S. 22:658 in effect at the time that plaintiff's property was damaged and when the claim was filed, which called for a twenty-five percent penalty in cases involving an insurer's failure to make payment within thirty days of receiving satisfactory written proof of loss, rather than under the amended version of the statute, which mandated a fifty percent *197 penalty in such cases, as well as attorney's fees and costs. At the time of the loss and during the initiation of loss adjustment, the statute at issue read in pertinent part:
§ 658. Payment and adjustment of claims, policies other than life and health and accident; personal vehicle damage claims; penalties; arson related claims suspension
A. (1) All insurers issuing any type of contract, other than those specified in R.S. 22:656, R.S. 22:657, and Chapter 10 of Title 23 of the Louisiana Revised Statutes of 1950, shall pay the amount of any claim due any insured within thirty days after receipt of satisfactory proofs of loss from the insured or any party in interest.
* * *
(3) Except in the case of catastrophic loss, the insurer shall initiate loss adjustment of a property damage claim and of a claim for reasonable medical expenses within fourteen days after notification of loss by the claimant. In the case of catastrophic loss, the insurer shall initiate loss adjustment of a property damage claim within thirty days after notification of loss by the claimant. Failure to comply with the provisions of this Paragraph shall subject the insurer to the penalties provided in R.S. 22:1220.
(4) All insurers shall make a written offer to settle any property damage claim, including a third-party claim, within thirty days after receipt of satisfactory proofs of loss of that claim.
B. (1) Failure to make such payment within thirty days after receipt of such satisfactory written proofs and demand therefor or failure to make a written offer to settle any property damage claim, including a third-party claim, within thirty days after receipt of satisfactory proofs of loss of that claim, as provided in Paragraphs (A)(1) and (4), respectively, or failure to make such payment within thirty days after written agreement or settlement as provided in Paragraph (A)(2), when such failure is found to be arbitrary, capricious, or without probable cause, shall subject the insurer to a penalty, in addition to the amount of the loss, of twenty-five percent damages on the amount found to be due from the insurer to the insured, or one thousand dollars, whichever is greater, payable to the insured, or to any of said employees, or in the event a partial payment or tender has been made, twenty-five percent of the difference between the amount paid or tendered and the amount found to be due as well as reasonable attorney fees and costs.
* * *
R.S. 22:658. In the aftermath of Hurricane Katrina, the legislature, by means of Acts 2006, No. 813, § 1, amended the statute by twice substituting the words "fifty percent" for "twenty-five percent" and added "as well as reasonable attorney fees and costs" in the first sentence of paragraph (B)(1).[4] This amendment became effective on August 15, 2006.
Plaintiff argues that Lafayette did not preserve its objection to the submitting of *198 the amended version of the statute to the jury. The Code of Civil Procedure article pertaining to objections to jury instructions states in pertinent part:
C. A party may not assign as error the giving or the failure to give an instruction unless he objects thereto either before the jury retires to consider its verdict or immediately after the jury retires, stating specifically the matter to which he objects and the grounds of his objection. If he objects prior to the time the jury retires, he shall be given an opportunity to make the objection out of the hearing of the jury.
C.C.P. art. 1793 C.
Here, the trial judge held the charging conference in chambers and the parties made their objections to the resulting jury charge and instructions during the conference. Following the charging conference, the parties made their closing statements, the trial judge charged and instructed the jury, and the jury began its deliberation. Immediately afterward, the trial judge gave the parties the opportunity to put their objections on the record and to proffer evidence. At that time, the judge stated:
We're going to put the objections on in here, so we can leave the door closed. Let the verdict show that counsel for all parties have complied with the provisions of Article 1793 of the Code of Civil Procedure with reference to special charges, and that prior to argument by counsel before the jury, the Court has informed counsel of those charges which the Court will give. Counsel, at a charge conference in chambers before the jury was charged and retired to deliberate, raised their objections to the general and special charges, given and refused, and to the form of the verdict stating specifically the matters to which they objected and the grounds therefore. For the sake of convenience of all concerned, and in the interest of conserving time, counsel have agreed to dictate their objections into the record, after the jury has retired for deliberation.
R., Vol. XIX at 58-9. Following the judge's comments, Lafayette properly objected to the jury instruction which used the amended form of R.S. 22:658. R., Vol. XIX at 172-3. Thus plaintiff's argument has no merit as the record affirmatively shows that Lafayette provided a contemporaneous objection to the jury charge.
Plaintiff further argues that, although Lafayette breached the duty of good faith and fair dealing required under the pre-amendment statute, the insurer's breach continued after the amendment became effective. Thus, Lafayette was subjected to the increased penalties and attorney's fees contained in the amendment, and plaintiff's petition for damages filed after the amendment's effective date constituted a separate proof of loss, triggering the application of the amended statute. In support of his argument, plaintiff brings to the Court's attention the cases of Theriot v. Midland Risk Ins. Co., 664 So.2d 547 (La. App. 3 Cir.1996) and Harris v. Fontenot, 606 So.2d 72 (La.App. 3 Cir.1992), which each held that the duties of good faith and fair dealing imposed on insurers by R.S. 22:658 are continuing duties that do not end during litigation. He further cites this Court's opinion in McDill v. Utica Mut. Ins. Co., 475 So.2d 1085 (La.1985), in which we held that an insurer was liable for statutory penalties even though the insurer's first notice of the claim was the filing of suit almost a year after the accident occurred.
In Manuel v. La. Sheriff's Risk Mgmt. Fund, 95-406 (La.11/27/95), 664 So.2d 81, we found that an insurer was liable for statutory penalties under R.S. 22:1220 for failing to pay a settlement after the settlement *199 had been reduced to writing, because, even though the policy was perfected and the accident had occurred prior to the statute's effective date, the claim for failure to pay the settlement first arose after the effective date. We distinguished the situation in Manuel from those described in the court of appeal opinions in Rusch v. Cook, 619 So.2d 122 (La.App. 1 Cir.1993), and Jeffries v. Estate of Pruitt, 93-1442 (La.App. 1 Cir. 6/24/94), 638 So.2d 723, in each of which both the accident and the conduct first exposing the insurer to liability occurred prior to the enactment of the statute.
Here, although an insurer has a continuing duty of good faith and fair dealing which extends throughout the litigation period, the claim first arose prior to the amendment of R.S. 22:658. Because the duty is a continuing one, had plaintiff not first made satisfactory proof of loss prior to the amendment of R.S. 22:658, his petition for damages served after the amendment became effective could have served as satisfactory proof, thereby triggering the time period set forth in the statute and could have subjected Lafayette to the penalties contained in the amendment because the claim would have first arisen after the amendment. Further, again because the duty is a continuing one, had plaintiff made satisfactory proof of loss prior to the amendment and had Lafayette paid that claim, and had plaintiff discovered new damage and made satisfactory proof which Lafayette failed to pay within the time period contained in the statute, but after the amendment became effective, Lafayette could have been subject to the penalties contained in the amendment because the claim would have arisen after the effective date of the amendment. Neither of those situations is the case here  the claim for the penalties contained within the statute arose prior to the effective date of the amendment. Plaintiff's argument that Lafayette's continuing breach of the duty of good faith and fair dealing made it subject to the increased penalties contained in the amended version of R.S. 22:658 is without merit.
Plaintiff next argues that the current version of R.S. 22:658 should apply retroactively because the statute is a "remedial" law which the legislature intended to have retroactive effect. This Court discussed the issue of retroactivity in Morial v. Smith & Wesson Corp, XXXX-XXXX (La.4/3/01), 785 So.2d 1, when we determined that a statute which precluded suits brought by political subdivisions against gun manufacturers could be applied retroactively. There we said:
Civil Code art. 6, entitled "Retroactivity of laws," provides:
In the absence of contrary legislative expression, substantive laws apply prospectively only. Procedural and interpretative laws apply both prospectively and retroactively, unless there is a legislative expression to the contrary.
A related statute, R.S. 1:2, provides:
No Section of the Revised Statutes is retroactive unless it is expressly so stated.
Although this statute may appear to conflict with La. C.C. art. 6, La. R.S. 1:2 has been limited to apply only to substantive and not procedural or interpretive legislation and the two provisions are therefore generally construed as being co-extensive.
Article 6 requires a two-fold inquiry:
First, we must ascertain whether in the enactment the legislature expressed its intent regarding retrospective or prospective application. If the legislature did so, our inquiry is at *200 an end. If the legislature did not, we must classify the enactment as substantive, procedural or interpretive. (Emphasis added, citations omitted).
Morial, 785 So.2d at 10, citing Cole v. Celotex Corp., 599 So.2d 1058, 1063 (La. 1992).
As stated in Cole, the legislature's intent as to the retroactive application of a statute must be present in the wording of the Act. Morial, 785 So.2d at 10; St. Paul Fire & Marine Ins. Co. v. Smith, 609 So.2d 809, 816-17(La.1992); Cole, 599 So.2d at 1063. In Cole, this Court determined that the legislature clearly intended that the statute at issue be applied prospectively only, due to the inclusion of language in the enactment setting out a future effective date. Cole, 599 So.2d at 1064. In contrast, in Morial and in State v. All Property and Cas. Ins. Carriers, 2006-2030 (La.8/25/2006), 937 So.2d 313, we determined that the legislature intended the statutes at issue be applied retroactively due to the explicit wording of those enactments. Morial, 785 So.2d at 10; All Property and Cas. Ins. Carriers, 937 So.2d at 322. Here, however, there is no indication in the wording of the statute as to the legislature's intent as to retroactivity.
Although plaintiff argues that a court should investigate the legislative history of a statute in order to determine the legislature's intent regarding retroactive application, neither Article 6 nor our prior jurisprudence indicate that the legislative history is a legitimate indicator of legislative intent when the retroactivity of a statute is in question. Even if it were, however, the legislative history of the amendment to R.S. 22:658 fails to clearly articulate the legislature's intent as to retroactivity.
In brief, Plaintiff argues that House Concurrent Resolution No. 58, contained in the "Historical and Statutory Notes" to R.S. 22:658, blames the "dilatory" conduct of insurance companies for delays in the recovery process. The purpose of this Resolution, however, did not concern either penalties for insurers or retroactivity, but rather urged the Attorney General to file suit seeking declaratory judgment concerning homeowner's insurance coverage exclusions for wind, hail, and hurricanes. Likewise, House Concurrent Resolution No. 59, which requests the Attorney General to file a declaratory judgment suit concerning the cause of "the flooding of New Orleans," fails to provide any indication of the legislature's intent regarding retroactivity.
Plaintiff further argues that the sponsor of the bill creating the amendment implied retroactive application of the amendment when he stated that increasing the penalties available under R.S. 22:658 would encourage insurers to timely resolve the claims of insureds who were "deal[ing] with the costs associated with a disaster." Although this language may indicate one legislator's possible intent as to the amendment, he did not state that the amendment was meant to apply retroactively, and his comments could just as well be said to apply to future as to past disasters.
Because the legislature failed to specify whether the amendment was designed to operate retroactively, we must now classify the amendment as substantive, procedural, or interpretive. With regard to such classification, we have stated:
Substantive laws establish new rules, rights, and duties or change existing ones. Procedural laws prescribe a method for enforcing a substantive right and relate to the form of the proceeding or the operation of the laws. Interpretive laws merely establish the meaning the interpreted statute had from the time of its enactment.
*201 Segura v. Frank, 93-1271, (La.1/14/94), 630 So.2d 714, 723.
Here, the amendment in question neither clarifies nor explains pre-existing law as it would were it interpretive, nor does it prescribe a method for enforcing a substantive right or relate to the form of a proceeding, as it would if it were procedural. Rather, the amendment changes a right to receive penalties, from twenty-five per cent to fifty percent of damages, and establishes a new right to attorney's fees. The amendment is unquestionably substantive, and as such cannot be applied retroactively.
Plaintiff's argument that the amendment should be applied retroactively because it is remedial is also without merit. Each type of statute, be it substantive, interpretive, or procedural, contains examples of laws which may be characterized as "remedial," however, this characterization is not one which is helpful or determinative when deciding whether the statute in question may be applied retroactively. See Dombrowski v. New Orleans Saints, XXXX-XXXX (La.App. 1 Cir. 8/2/06), 943 So.2d 403, 408.

Attorney's Fees under Civil Code art. 1997
Plaintiff argues that, pursuant to C.C. art. 1997, he is entitled to attorney's fees due to Lafayette's bad faith breach of contract. Louisiana courts have long held that attorney's fees are not allowed except where authorized by statute or contract. E.g., Rivet v. State, 96-0145 (La.9/5/96), 680 So.2d 1154; State, DOTD v. Williamson, 597 So.2d 439, 441 (La. 1992). Article 1997 reads in its entirety, "An obligor in bad faith is liable for all the damages, foreseeable or not, that are a direct consequence of his failure to perform." Neither the statute nor the insurance contract mentions attorney's fees. In keeping with our past holdings, we find that in cases of breach of contract, Article 1997 does not provide for an award of attorney's fees.

Mental Anguish
Plaintiff assigned as error the court of appeal's failure to correct the trial court's refusal to instruct the jury regarding general damages for mental anguish, inconvenience, and emotional distress pursuant to Civil Code article 1998, and by failing to include a line on the verdict form for damages for those claims. He argued these two assignments collectively. Plaintiff also specified as error that the court of appeal erred by not reversing the trial court's refusal to allow plaintiff to present evidence as to mental anguish, inconvenience, and emotional distress. Plaintiff did not, however, argue this assignment of error.
We have previously discussed the ramifications of legal error in exclusion of evidence as follows:
Where a finding of fact is interdicted because of some legal error implicit in the fact finding process or when a mistake of law, such as a consequential but erroneous ruling on the exclusion or admission of evidence, forecloses any finding of fact, and the record is otherwise complete, the appellate court should, if it can, render judgment on the record. Nevertheless, LSA-C.C.P. art. 2164 provides that an "appellate court shall render any judgment which is just, legal and proper upon the record on appeal." It is well settled that an appellate court is empowered under this article to remand a case to the district court for the taking of additional evidence where it is necessary to reach a just decision and to prevent a miscarriage of justice. Although a court should always remand a case whenever the nature and extent of the proceedings dictate such a course, *202 whether or not any particular case should be remanded is a matter which is vested largely within the court's discretion and depends upon the circumstances of the case. (Citations omitted).
Foley v. Entergy La., Inc., XXXX-XXXX (La.11/29/06), 946 So.2d 144, 164.
Here, as plaintiff stated in brief, he did, in fact, offer evidence in support of a mental anguish claim, including testimony as to plaintiff's love and pride in his home, that the property was the only property plaintiff purchased in this country, and that the home was located in a very beautiful neighborhood. The trial court allowed plaintiff to proffer further evidence in support of his mental anguish claim. There is no indication, and plaintiff makes no claim, that the trial court limited the content or form of the proffer in any manner.
As we stated in Foley, "The very purpose of requiring a proffer is to preserve excluded testimony so that the testimony (whatever its nature) is available for appellate review." Foley, 946 So.2d at 166. Plaintiff submitted his proffer which was reviewed, along with the entirety of the record, by the court of appeal.
Plaintiff rests his claim for mental anguish damages on Civil Code art. 1998, which reads in its entirety:
Damages for nonpecuniary loss may be recovered when the contract, because of its nature, is intended to gratify a nonpecuniary interest and, because of the circumstances surrounding the formation or the nonperformance of the contract, the obligor knew, or should have known, that his failure to perform would cause that kind of loss.
Regardless of the nature of the contract, these damages may be recovered also when the obligor intended, through his failure, to aggrieve the feelings of the obligee.
C.C. art. 1998.
After reviewing the record, the proffered evidence, and the applicable law, the court of appeal determined that while plaintiff had produced evidence of plaintiff's alleged mental anguish, there was no evidence, either on the record or in proffer, as to Lafayettes' actions which demonstrated that "the obligor intended, through his failure, to aggrieve the feelings of the obligee," and that therefore, plaintiff was not materially or prejudicially affected or deprived of substantial rights. Sher, 973 So.2d at 52-3.
This matter arises from an alleged breach of a commercial all-risk insurance contract. The common purpose of a commercial insurance contract is to provide for the protection of one of the contracting parties, the insured, from economic loss as a consequence of covered hazardsa commercial insurance policy is not designed to gratify nonpecuniary interests, it is meant to protect pecuniary interests. Further, although plaintiff provided evidence at trial and through proffer that the property had sentimental value to him, he did not provide any evidence that Lafayette knew or should have known that failure to perform would cause mental anguish damages. Neither did plaintiff provide proof through proffer that Lafayette intended to "aggrieve the feelings" of plaintiff. Just as was the case in our recent opinion in Aucoin v. Southern Quality Homes, XXXX-XXXX (La.2/26/08), 984 So.2d 685:
[T]he obligee must intend "to gratify a significant nonpecuniary interest by way of the contract," and the obligor must or should know that failure to perform would cause non pecuniary loss. Regardless of whether plaintiff has or has not proven that he intended to gratify a significant nonpecuniary interest, he *203 presented no evidence that the [obligor] knew or should have known that his failure to perform would cause nonpecuniary loss. Further, there was no evidence presented that the [obligor] "intended, through his failure, to aggrieve the feelings of the obligee" as required by La. C.C. art. 1998.
Aucoin, 984 So.2d at 696-97.
Because plaintiff failed to produce adequate evidence on which the jury could have based an award of mental anguish damages, the court of appeal correctly found that the trial court's decision to disallow a jury instruction regarding mental anguish damages pursuant to Article 1998 did not effect the outcome of the trial, and therefore, was not error. By means of the same analysis, we conclude that the trial court's error, if any, in disallowing the proffered evidence to be presented to the jury, and in failing to include a line item for mental anguish on the jury verdict form were harmless, in that there was no legal basis for the jury to have found damages for mental anguish. Under the particular circumstances of this case, we cannot conclude that either the trial court or the court of appeal abused its discretion.

Judicial Interest
Finally, plaintiff argues that the court of appeal erred in finding that Lafayette owed interest on penalties from date of judgment rather than from date of judicial demand.
While we have never directly been confronted with the question of when interest begins accruing on penalties imposed by R.S. 22:658, we have discussed the question of interest with regard to statutory penalties in the worker's compensation setting:
Both federal and state jurisprudence is nearly uniform in holding that penalty interest is entirely of the post-judgment variety, and thus is calculated only from the date the penalties are awarded until the date they are paid.
* * *
Just as with attorney's fees awards, penalties are never automatically assessed against the defeated party, but rather are awarded only when the statutory requirements for such are met ... Because awards of penalties and attorney's fees are not automatic ..., but rather rest within the discretion of the [fact finder], they come due, if at all, only on the date of their award ...; thus, such awards may not earn interest until after that date.
Sharbono v. Steve Lang & Son Loggers, 97-0110 (La.7/1/97), 696 So.2d 1382, 1389.
Just as penalties in a worker's compensation action are not automatic and are subject to the discretion of a fact finder, so, too, are the penalties imposed by R.S.22:658. Interest on penalties cannot be figured until penalties are imposed. Like penalties imposed under the worker's compensation statutes, the penalties imposed on insurers become due only after the date of their award, and interest on such penalties is due only from the date of judgment.

Lafayette's Remaining Claims of Error

Exclusions/Policy Defenses
Lafayette argues that both the trial court and court of appeal erred in finding that the insurance policy provided coverage for plaintiff's business personal property located on the premises. The courts below each ruled that policy exclusions limiting coverage were affirmative defenses and, as such, must be specifically pled per C.C.P. arts. 1003 and 1005.
Lafayette, in its answer, stated:
Lafayette adopts the terms, conditions, coverages, exclusions, and endorsements *204 of its policy, as if copied herein in extensio, [sic] as a defense to petitioner's claims; Lafayette further pleads all defenses, exclusions, rights and remedies under the policy of insurance issued by Lafayette to petitioner.
In discussing the issue of specific pleading of policy exclusions, the court of appeal says that an affirmative defense is one that "raises a new matter, which assuming the allegations in the petition are true, constitutes a defense to the action," Sher, 973 So.2d at 54. The court of appeal further states that "[r]eliance upon an exclusion in an insurance contract is considered to be an affirmative defense, which must be specifically pleaded in defendant's answer," and that "[i]n the absence of such a pleading, no proof can be offered in connection with the exclusion." Sher, 973 So.2d at 54. Further, "[t]he purpose of specifically pleading an affirmative defense is to give fair notice to the plaintiff of the nature of defenses," "prevents trial by ambush and does not give the defendant an unfair advantage." Sher, 973 So.2d at 54.
The court of appeal is correct that Louisiana appellate courts have for decades required that exclusions to insurance contracts be specifically pleaded as affirmative defenses.[5] That, however, is not the issue hererather, the issue is whether, in this case, Lafayette was required to plead each exclusion specifically, rather than by pleading the entire policy, including the exclusions, in extenso. In this specific case, the exclusions are not affirmative defenses. As stated above, an affirmative defense raises a new matter, which assuming the allegations in the petition are true, constitutes a defense to the action. The new matter must be one, however, that is not raised in the plaintiff's petition. E.g., Alexander v. Cornett, 42, 147 (La.App.2d Cir.7/11/07), 961 So.2d 622, 628. Here, plaintiff, in his petition, stated that "[a]n all risk policy creates a special type of coverage extending to every conceivable loss or damage, unless clearly, specifically and expressly excluded therein." R. at 3. The policy exclusions, then, are not new mattersthey were first raised in plaintiff's own petition. Further, Lafayette did plead "all ... exclusions ... under the policy," including the defenses at issue. The courts below erred in finding that evidence as to Lafayette's policy exclusions should be barred.

Business Personal Property
Lafayette claims that the court of appeal erred in affirming the trial court's allowing of evidence as to plaintiff's business personal property loss into evidence, when plaintiff did not have business personal property coverage. Although the court of appeal found that Lafayette had waived the argument that the policy did not cover business personal property by failing to specifically plead the affirmative defense, the court of appeal also stated that the policy was ambiguous as to whether there was business personal property coverage. We disagree.
Under Part A, Coverage, the policy states in pertinent part:
A. COVERAGE
We will pay for direct physical loss or damage to Covered Property at the premises described in the Declarations caused by or resulting from any Covered Cause of Loss.
1. Covered Property
Covered Property, as used in this Coverage Part, means the following *205 types of property for which a Limit of Insurance is shown in the Declarations.
a. Building meaning the building or structure described in the Declarations ...
b. Your Business Personal Property located in or on the building described in the Declarations or in the open (or in a vehicle) within 100 feet of the described premises, consisting of the following unless otherwise specified in the Declarations or on the Your Business Personal PropertySeparation of Coverage form ...
As can be seen from the above policy language, property is only Covered Property if there is a Limit of Insurance shown on the declarations page. On the declarations page for the Commercial Property Coverage Part are listed: Building, with a limit of insurance of $463,000; and Rental Value-With Extra Expense, with a limit of insurance of $18,000. No other covered property is listed on the declarations page with a limit of coverage. Contrary to the court of appeal's reasoning, the absence of a reference to business personal property on the declarations page does not create an ambiguity, rather, it definitively shows that business personal property is not covered property under the policy at issue, as defined by the words of that policy.
The courts below erred in awarding plaintiff $31,577 for business personal property loss.

Lost Rents
Lafayette argues that the courts below erred in awarding plaintiff $17,350 for lost rents,[6] $8,550 of which was for the basement apartment, as that apartment was damaged by flood, which is not a covered loss. The water level in the basement apartment rose to approximately four feet deep. Based on our earlier finding that the water damage exclusion is not ambiguous, we find that Lafayette's argument has merit. The courts below erred in awarding plaintiff $8,550 in lost rents for the basement apartment. The award for lost rents will be amended to the amount of $8,800.

Building Damages
Lafayette argues that plaintiff's award for building damages should be reduced as a forty-five percent allowance for overhead and profit is grossly excessive, damages for "water hammer" are not covered under the policy, and there was no evidence of structural damage.
As the court of appeal stated, plaintiff's architectural expert's estimate did not include a forty-five percent allowance for overhead and profit, but only a twenty-five percent allowance, which the expert testified was reasonable and typical, as allowed by Louisiana Office of State Facility Planning and Control. R., Vol. XVII at 93. The expert further testified that the remaining twenty percent was for contingency purposes included for "unidentified costs in construction jobs." R., Vol. XVII at 93. During his testimony, plaintiff's expert described contingency costs as "real, foreseeable, but unidentified costs," that "always happen on a job." R., Vol. XVII at 93. Based on plaintiff's expert's unopposed testimony, the jury did not err in accepting plaintiff's expert's figures as to overhead, profit, and contingency costs.
Lafayette claims that "water hammer" damages are not covered under the policy; however, Lafayette fails to point to an *206 exclusion which would exclude coverage for the damages. In the absence of any indication that a valid exclusion exists, it is impossible for this Court to determine that the trial court committed error in awarding "water hammer" damages.
With regard to proof of structural damages, plaintiff's structural engineering expert testified that in his opinion, while he could not state to an absolute certainty that the building in question suffered structural damage without tearing out the walls, based on the fact that the building had been shaken by hurricane force winds for several hours and had suffered cracks in the walls due to that shaking, it was probable that the building had suffered structural damage. R., Vol. XVI at 155-161. Further, the expert testified that one of the building's porches had sustained cracks as it and the house moved in the wind. R., Vol. XVI at 162. Based on this expert's testimony, the trial court did not err in awarding damages for structural damages to the building.

Arbitrary, Capricious, Without Probable Cause
Lafayette argues that the trial court erred in finding that Lafayette's conduct in handling plaintiff's claims was arbitrary, capricious, and without probable cause because Lafayette initiated loss adjustment within thirty days, disputed the flood claim in good faith, disputed the business personal property claim in good faith, disputed the lost rents claim in good faith, and disputed the building damages claim in good faith.
This Court discussed arbitrary and capricious conduct in relation to R.S. 22:658 in the case of Reed v. State Farm Mut. Auto Ins. Co., 03-0107, (La.10/21/03), 857 So.2d 1012, where we said:
The conduct prohibited in R.S. 22:658(A)(1) is virtually identical to the conduct prohibited in R.S. 22:1220(B)(5): the failure to timely pay a claim after receiving satisfactory proof of loss when that failure to pay is arbitrary, capricious, or without probable cause. The primary difference is the time periods allowed for payment. Furthermore, R.S. 22:658 and R.S. 22:1220 are penal in nature and must be strictly construed.
One who claims entitlement to penalties and attorney fees has the burden of proving the insurer received satisfactory proof of loss as a predicate to a showing that the insurer was arbitrary, capricious, or without probable cause. It logically follows from this burden that a plaintiff who possesses information that would suffice as satisfactory proof of loss, but does not relay that information to the insurer is not entitled to a finding that the insurer was arbitrary or capricious. The sanctions of penalties and attorney fees are not assessed unless a plaintiff's proof is clear that the insurer was in fact arbitrary, capricious, or without probable cause in refusing to pay. The statutory penalties are inappropriate when the insurer has a reasonable basis to defend the claim and acts in good-faith reliance on that defense. Especially when there is a reasonable and legitimate question as to the extent and causation of a claim, bad faith should not be inferred from an insurer's failure to pay within the statutory time limits when such reasonable doubts exist.
Both R.S. 22:658 and R.S. 22:1220 require proof that the insurer was "arbitrary, capricious, or without probable cause," a phrase that is synonymous with "vexatious." This court has noted that "vexatious refusal to pay" means unjustified, without reasonable or probable cause or excuse. Both phrases describe an insurer whose willful refusal of *207 a claim is not based on a good-faith defense.
Whether or not a refusal to pay is arbitrary, capricious, or without probable cause depends on the facts known to the insurer at the time of its action ... Because the question is essentially a factual issue, the trial court's finding should not be disturbed on appeal absent manifest error. However, when the record does not support the trial court's determination on this issue, the trial court's decision will be reversed.
Reed, 857 So.2d at 1020-21.
With regard to the initiation of loss adjustment, Lafayette asserts that it first received notice of plaintiff's claim on October 5, 2005; that it assigned an adjuster that same day; that the adjuster called plaintiff on October 9, 2005, but was unable to speak to him; that the adjuster spoke to plaintiff later in October and made arrangements to inspect the property on November 1, 2005; that the property was inspected on November 1, 2005; and that evidence of each of these facts was presented to the jury. Plaintiff largely agrees with this sequence of events, except that plaintiff's son testified that he had provided notice to Lafayette of the claim during the first two weeks of September, 2005. Based on these facts, the jury was not manifestly erroneous in accepting plaintiff's son's testimony and concluding that Lafayette failed to initiate loss adjustment within thirty days after receiving notice of the claim.
Lafayette, after its initial inspection, found that most of the damage to the property was not covered under the policy due to lack of maintenance, and disrepair. Lafayette estimated plaintiff's damages at $3,307.09. Lafayette had inspected the building in 1994, 2001, 2002, and 2003, each time finding that the property was well maintained. Further, Lafayette's own engineer did not feel that the property was poorly maintained or in disrepair, and Lafayette misrepresented the engineer's findings in a letter to plaintiff, stating that the engineer had concluded that "the majority of the damages were pre-existing and caused by a lack of maintenance." Despite plaintiff sending numerous estimates and invoices to Lafayette, the insurer refused to reconsider its damage estimate. Finally, Lafayette failed to tender the undisputed portion of plaintiff's lost rents. Based upon the evidence presented, the jury was not manifestly erroneous in concluding that Lafayette's actions were "vexatious," and thus arbitrary, capricious, and without probable cause.

Costs
The trial court awarded plaintiff his documented costs under C.C. art. 970 in the amount of $42,020.24. Lafayette argues that this award is error, in that Article 970 allows for the imposition of costs only if the final judgment of actual damages is more than twenty-five percent greater than plaintiff's offer of judgment.
Article 970 reads in pertinent part:
A. At any time more than thirty days before the time specified for the trial of the matter ... any party may serve upon an adverse party an offer of judgment for the purpose of settling all of the claims between them ...
* * *
C. If the final judgment obtained by the plaintiff-offeree is at least twenty-five percent less than the amount of the offer of judgment made by the defendant-offeror or if the final judgment obtained against the defendant-offeree is at least twenty-five percent greater than the amount of the offer of judgment made by the plaintiff-offeror, the offeree *208 must pay the offeror's costs, exclusive of attorney fees, incurred after the offer was made, as fixed by the court.
* * *
The courts below erred in charging Lafayette with costs as this Court's amended judgement is not at least twenty-five percent greater than plaintiff's offer of judgment. Plaintiff's offer of judgment was $225,000. Twenty-five percent of that amount is $56,250. Lafayette would only be required to pay plaintiff's costs if plaintiff's final award was at least $281,250. This Court's amended judgment awards plaintiff $230,812.

CONCLUSION
For the reasons recounted above, we amend the judgment to award the following amounts:

Building Damage Above the Basement $ 175,850.00
Building Damage In the Basement 0.00
Lost Rents 8,800.00
Business Personal Property 0.00
Penalties Pursuant to R.S. 22:658 46,162.50
 ___________
TOTAL $ 230,812.50
Costs Pursuant to C.C.P. art. 1920 $ 16,288.60
Costs Pursuant to C.C.P. art. 970 0.00
Attorney's Fees Pursuant to C.C. art. 1997
 and/or R.S. 22:658 0.00
 ___________
TOTAL $ 16,288.60

The judgment is amended to award plaintiff a total of $247,001.10. Interest on damages to run from date of judicial demand and interest on penalties to run from date of the trial court judgment.

DECREE
For the reasons given, we affirm in part, reverse in part, and render judgment.
AFFIRMED IN PART, REVERSED IN PART, AND RENDERED
VICTORY, J., concurs in the result.
KNOLL, J., concurs in part and dissents in part and assigns reasons.
WIEMER, J., concurs in the result.
KNOLL, J., concurring in part and dissenting in part.
Although I concur in the result of the majority opinion's treatment of most of the issues presented, with all due respect I dissent from the majority's failure to apply the amended version of La.Rev.Stat. § 22:658 to the facts of this case, and its rejection of plaintiff's claim for nonpecuniary damages under the provisions of La. Civ.Code art.1998 and La.Rev.Stat. § 22:1220.

Penalty Provisions
Plaintiff argues the appellate court erred when it found the post-Katrina amendment to La.Rev.Stat. § 22:658 inapplicable to his claims. In its rejection of this argument, the majority opinion, while recognizing Lafayette's continuing duty of good faith and fair dealing, grounds its holding on the basis that the plaintiff's claim arose prior to the amendment, i.e., he submitted a satisfactory proof of loss prior to the amendment thereby triggering the time period set forth in the statute. In addition, the majority further opines the plaintiff did not discover new damage after the amendment of the statute became effective for which Lafayette failed to pay. Op. at 199. In my view the analysis is fundamentally flawed by finding the application of the amendment is limited to the filing of a satisfactory proof of loss "triggering the time period set forth in the statute" rather than based upon the conduct of the insurer. Further, the majority's analysis frustrates and fails to recognize the Legislature's strong public policy efforts to discourage the arbitrary and capricious conduct of the insurer in dealing fairly and in good faith with their insured.
*209 Because the insurer's obligation is a continuing obligation, the application of the amendment is not limited to the time frame set forth in the statute, thus I find it only necessary to examine whether Lafayette breached its duty of good faith and fair dealing after the amendment became effective.[1]
La.Rev.Stat. §§ 22:658 and 22:1220 impose a duty of good faith and fair dealing on an insurer, specifically to "adjust claims fairly and promptly and to take reasonable steps to settle valid claims." Chargois v. Guillory, 97-439 (La.App. 3 Cir. 10/29/97), 702 So.2d 1068, 1069. Recognizing this duty and applying it to post-Katrina cases, I agree with the decisions of the U.S. District Courts for the Eastern District of Louisiana on this issue that have recognized this duty is a continuing duty of good faith and fair dealing on the insurer's part, and have applied the amended version of La.Rev.Stat. § 22:658 prospectively where the insurer's misconduct continued after August, 15, 2006, the effective date of the amendment. See e.g., Goodwyne v. State Farm Fire & Cas. Co., 2007 WL 4365437 (E.D.La.12/11/07); Kodrin v. State Farm Fire Ins. Co., 2007 WL 4163437 (E.D.La.11/21/07) Conlee v. Fireman's Fund Ins. Co., 2007 WL 2071860 (E.D.La.7/17/07). As a matter of analysis, one of the federal courts stated:
In Manuel v. Louisiana Sheriff's Risk Management Fund, 664 So.2d 81, 86 (La.1995), the Louisiana Supreme Court dealt with whether section 1220 applied to the plaintiff's bad faith claims, when at the time of the accident, section 1220 had not yet been enacted. In Manuel, the application of the penalty centered around the failure of the insurer to pay funds per a settlement agreement reached by the parties. The actual settlement of the claim with the insurer and the failure of the insurer to pay the funds in accordance with the settlement occurred one year after the enactment of Section 1220. While the event triggering the insurance claim occurred before the enactment, the alleged breach of the insurer's duty of good faith and fair dealing occurred and continued to occur after the enactment of the statute. As such, the Louisiana Supreme Court found that, although the breach occurred after the statute's enactment, retroactivity was not an issue. Instead, the Court applied the statute prospectively and found that the insurer was subject to the newly enacted penalty provisions.
During oral argument in the instant case, defense counsel admitted that an insurer owes an insured a continuing duty of good faith and fair dealing. While it seems that Defendant's alleged misconduct (alleged failure to promptly pay Plaintiffs' claims) may have begun before the amendment to 22:658, Plaintiffs allege that Defendant's misconduct continued after the effective date of the amendment on August 15, 2006. In fact, Defendant did not pay anything to Plaintiffs until January 5, 2007. Consequently, the Court concludes that Defendant's post-amendment misconduct coupled with Defendant's continuing duty to fairly and promptly adjust claims may suggest a finding that, as a matter of law, Defendant is subject to the 2006 amendment to Section 658. Thus, Plaintiff's potential recovery of penalties under La. R.S. 22:658 should be 50 percent *210 of the amount found to be due, if any, under the homeowners policy.
Conlee, at *3.
In the case at hand, we affirm the lower courts' findings of the insurer's unfair dealings and bad faith conduct with their insured, but the majority fails to recognize this conduct after the effective date of the amendment. In my view, this reasoning is flawed and diminishes an insurer's continuing obligation of good faith and fair dealing with its insured. Under the majority's rationale, even if the proof of loss is submitted by the insured before the effective date of the amendment and the conduct of the insurer changes after the effective date of the amendment, the amendment cannot be applied because the proof of loss was filed before the effective date. This is simply wrong.
The basis for imposing the penalty is conduct and the filing of a proof of loss does not toll the application of the penalty other than to set up an expectation of payment to the insured. The majority's limitation of the amendment's application to the filing of the proof of loss is a misinterpretation of the statute.
The majority recognizes that Lafayette repeatedly refused to pay plaintiff's Katrina property damages because of its contention the property was poorly maintained. Indeed, even the majority opinion finds "Lafayette's actions were `vexatious,' and thus arbitrary, capricious, and without probable cause[,]" and affirms the jury's finding that Lafayette failed to timely adjust the plaintiff's claim. Op. at 207. Even after Lafayette "learned" on September 5, 2006, well after the effective date of the amended version of La.Rev.Stat. § 22:658, it had inspection reports in its own files showing the property was well maintained, it failed to tender payment. The insurer's continuing duty to deal fairly and in good faith with its insured did not stop when plaintiff filed his proof of loss. The majority's interpretation of this statute limits the insurer's obligation of good faith and fair dealing to the filing of the property loss and the time frame set out for payment of the loss, which is internally inconsistent with a continuing duty requirement. This interpretation misses the entire focus and purpose of the penalty statutethe bad faith conduct of the insurer. The majority takes the "teeth" out of the consequences for a breach of a continuing duty and renders it meaningless. So now, as soon as an insured files a proof of loss and the time delays as set forth in the statute expire, the continuing duty of good faith and fair dealing ceases to be required. I disagree. The conduct of defendant in this case exemplifies the type of conduct the Legislature was trying to discourage when it amended the statute. Thus, I find the amendment applies under the facts of this case.

Nonpecuniary Damages
The majority opinion rejects plaintiff's contention the trial court erred in its refusal to instruct the jury about mental anguish, inconvenience, and emotional distress as an element of general damages under La. Civ.Code art. 1998. In its rejection of plaintiff's assignment of error, the majority concludes plaintiff failed to adduce evidence that Lafayette knew or should have known that failure to perform would result in mental anguish damages, and that Lafayette intended to aggrieve P's feelings. Op. at 202.
In the present case, the plaintiff contends he did not merely insure the monetary value of his house and belongings, but that he "insured his home, his residence, which sat in damaged condition for months on end while Lafayette arbitrarily and capriciously refused to pay the proceeds owed under the Policy." Brief of the *211 Plaintiff, Joseph Sher.[2] Accordingly, he contended in the trial court that he was entitled to nonpecuniary damages and unsuccessfully sought a jury instruction in that regard.
The basis of plaintiff's claim for these general damages rests on La. Civ.Code art. 1998 and La.Rev.Stat. § 22:1220.[3] La. Civ.Code art. 1998 provides:
Damages for nonpecuniary loss may be recovered when the contract, because of its nature, is intended to gratify a nonpecuniary interest and, because of the circumstances surrounding the formation or the nonperformance of the contract, the obligor knew, or should have known, that his failure to perform would cause that kind of loss.
Regardless of the nature of the contract, these damages may be recovered also when the obligor intended, through his failure, to aggrieve the feelings of the obligee.
Nonpecuniary damages (damages for mental anguish, inconvenience, humiliation and embarrassment) as explained by the drafters of La. Civ.Code art. 1998, are "damage[s] of a moral nature which do[] not affect a `material' or tangible part of a person's patrimony." Comment (b), Revision Comment, La. Civ.Code art. 1998, citing Litvinoff, "Moral Damages," 38 La. L.Rev. 1 (1977). It is these moral damages that are addressed under La. Civ. Code art. 1998.
In examining the issue the plaintiff raises, I observe the majority opinion makes no mention of La.Rev.Stat. § 22:1220 or of Orellana v. Louisiana Citizens Property Ins. Corp., 07-1095 (La.App. 4 Cir. 12/5/07), 972 So.2d 1252, a recent appellate case that addressed the same issue plaintiff posits to this Court. I find both omissions from the majority opinion shed light on the issue presented herein.
La.Rev.Stat. § 22:1220 provides, in pertinent part:
A. An insurer, including but not limited to a foreign line and surplus line insurer, owes to his insured a duty of good faith and fair dealing. The insurer has an affirmative duty to adjust claims fairly and promptly and to make a reasonable effort to settle claims with the insured or the claimant, or both. Any insurer who breaches these duties shall be liable for any damages sustained as a result of the breach.
B. Any one of the following acts, if knowingly committed or performed by an insurer, constitutes a breach of the insurer's duties imposed in Subsection A:
(1) Misrepresenting pertinent facts or insurance policy provisions relating to any coverages at issue.
(2) Failing to pay a settlement within thirty days after an agreement is reduced to writing.
(3) Denying coverage or attempting to settle a claim on the basis of an application which the insurer knows was *212 altered without notice to, or knowledge or consent of, the insured.
(4) Misleading a claimant as to the applicable prescriptive period.
(5) Failing to pay the amount of any claim due any person insured by the contract within sixty days after receipt of satisfactory proof of loss from the claimant when such failure is arbitrary, capricious, or without probable cause.
(6) Failing to pay claims pursuant to R.S. 22:658.2 when such failure is arbitrary, capricious, or without probable cause.
C. In addition to any general or special damages to which a claimant is entitled for breach of the imposed duty, the claimant may be awarded penalties assessed against the insurer in an amount not to exceed two times the damages sustained or five thousand dollars, whichever is greater. Such penalties, if awarded, shall not be used by the insurer in computing either past or prospective loss experience for the purpose of setting rates or making rate filings.
Commenting upon La.Rev.Stat. § 22:1220, the Fourth Circuit recently stated:
La. R.S. 22:1220 clearly states that an insurance company may be assessed general and special damages for breach of the imposed duty, and may be assessed penalties in addition. In this case, the trial court made a finding that Louisiana Citizens acted in bad faith for its failure to properly and timely adjust Plaintiffs claim. We find no error in this finding, especially in light of the fact that findings of fact of the trial court are given great weight and are only overturned if manifestly erroneous or clearly wrong. See Stobart v. State, Through DOTD, 617 So.2d 880 (La.1993).
* * *
In this case, Plaintiff has had to watch his home sustain ongoing damage as a result of Louisiana Citizens' decision to not pay timely insurance payments, which qualifies the case under subsection (1). Had Louisiana Citizens actions not been so arbitrary and capricious in its failure to pay Plaintiff's claim, Plaintiff could have prevented further deterioration of the home and/or allowed Plaintiff the opportunity to properly rebuild.
Orellana, 972 So.2d at 1252.
Under La. Civ.Code art. 1998, a party may recover nonpecuniary damages "when the obligor intended, through his failure, to aggrieve the feelings of the obligee." "Intent" denotes the actor desires the consequences of his act, or that he believes that the consequences are substantially certain to follow from it. Restatement (Second) of Torts § 8A (1965). As found in the majority opinion, Lafayette's actions in failing to timely and properly adjust the plaintiff's claim were vexatious and constituted conduct that was arbitrary, capricious, and without probable cause. Op. at 207. Stated another way, in contravention of its continuing and affirmative duty under La. Rev.Stat. § 22:1220, Lafayette failed to adjust plaintiff's claim fairly, it was dilatory, and it did not make a reasonable effort to settle plaintiff's claims. As a direct result of Lafayette's arbitrary and capricious conduct, the plaintiff's immovable property remained in a damaged condition for months.
As I perceive this issue, regardless of the fact that this case involves an insurance contract,[4] Lafayette's conduct clearly *213 evidences intentional conduct. As addressed in the second paragraph of La. Civ.Code art. 1998, Lafayette's intentional conduct aggrieved the feelings of its insured. In particular, Lafayette knew the consequences that were sure to follow the course of action it chose to follow. Thus, I find defendant "should have known" that it was causing Mr. Sher mental anguish, inconvenience, and emotional distress. It would be unreasonable to think otherwise. The well phrased comments the Court of Appeal, Fourth Circuit, stated about the emotional impact Louisiana Citizens' recalcitrance had on Orellana are equally, if not more so, applicable to Lafayette's vexatious conduct with regard to the plaintiff herein. Against that backdrop and applying La. Civ.Code art. 1998 together with La.Rev.Stat. § 22:1220, I find the bad faith on the part of Lafayette presented a basis for the trial court to instruct the jury on damages for a nonpecuniary loss. See e.g., Beasley v. Ed's Mobile Homes, Inc., 01-1549 (La.App. 3 Cir. 4/17/02), 824 So.2d 383, 388-89, writ denied, 825 So.2d 1170 (La.9/20/02); Ducote v. Perry's Auto World, Inc., 98-1972 (La.App. 1 Cir. 11/5/99), 745 So.2d 229 (finding the plaintiffs entitled to nonpecuniary damages even though their underlying contracts were pecuniary in nature). Accordingly, I disagree with the majority opinion on its rejection of plaintiff's argument in this regard. Therefore, I find the trial court erred in failing to instruct the jury on the issue of nonpecuniary damages.
PER CURIAM.[1]
We granted a rehearing in this matter for the sole purpose of reconsidering plaintiff's claim to entitlement of an award of court costs pursuant to LSA-C.C.P. art. 970.[2] Plaintiff's offer of judgment to Lafayette Insurance Company on February 9, 2006, for $225,000 was "inclusive of costs, interest, attorney fees and any other amount which may be awarded Plaintiff against Lafayette in this matter." Sher v. Lafayette Insurance Company, 07-0757, p. 34 (La.App. 4 Cir. 11/19/07), 973 So.2d 39, 65. In this court's original opinion, it was noted that Lafayette would only be required to pay plaintiff's costs pursuant Article 970 if plaintiff's final award was at least $281,250. This court stated the amended judgment was $230,812.50. However, this amount did not include interest on damages from date *214 of judicial demand, the amount of court costs pursuant to LSA-C.C.P. art. 1920, and interest on those court costs from the date of judgment assessing those court costs (May 2, 2007).[3] When those three amounts are combined with the interest calculations provided by Lafayette in its opposition to plaintiff's application for rehearing the amended judgment exceeds $281,250 by $956.14.
Thus, we reinstate the lower courts' award to plaintiff of $42,020.24 in costs awarded pursuant to LSA-C.C.P. art 970(C).
The rehearing is otherwise denied.
KNOLL, J., concurs in part and dissents in part and assigns reasons.
HIGHTOWER, Justice ad hoc, would deny the rehearing.
TRAYLOR, J., would deny the rehearing.
KNOLL, J., concurs in part and dissents in part.
I agree with the per curiam, which reinstates the award of costs pursuant to La.Code Civ. Pro. art. 970C.
However, I dissent in part from the denial of rehearing on the issue of the amendment to La.Rev.Stat. 22:658 and the issue of non-pecuniary damages. I would grant rehearing on those issues, and deny rehearing as to all other issues.
NOTES
[*] Retired Judge Lemmie O. Hightower assigned as Associate Justice Ad Hoc sitting for Chief Justice Pascal F. Calogero, recused.
[1] The Louisiana House of Representatives, in House Concurrent Resolution 59, 2005, found in the Historical and Statutory Notes to R.S. art. 22:658, repeatedly refers to the inundation in and around New Orleans following Hurricane Katrina as "flooding."
[2] Waves may be caused by wind, boats, or even cars driven in high water. Tidal waves are caused by seismic events, such as earthquakes, underwater landslides (which may be natural or man-made), or underground nuclear testing. Water may overflow its natural boundaries because of seasonal rising of the water level, damming, levee breakage, or other natural and man-made causes.
[3] We note that under the generally prevailing definition of the word "flood"  the overflow of a body of water causing a large amount of water to cover an area that is usually dry  the inundation of property due to broken water mains or overflowing sinks would not be excluded as a "flood," as neither a water main nor a sink is a "body of water."
[4] This amendment also added a final sentence to paragraph B(1), which reads, "Such penalties, if awarded, shall not be used by the insurer in computing either past or prospective loss experience for the purpose of setting rates or making rate filings." Another amendment to the statute, Acts 2006, No. 404, § 1, in paragraph (A)(1), in the first sentence, deleted "R.S. 22:" preceding "657", and added a second sentence, which reads, "The insurer shall notify the insurance producer of record of all such payments for property damage claims made in accordance with this Paragraph."
[5] We note that there is a split in the circuits on the issue of whether contract provisions must be specifically pled. Based on plaintiff's allegations in his petition in this case, we do not find it necessary to address this issue at this time.
[6] Post-Katrina, plaintiff rented two of the upper floor apartments at the rate of $1400 per month.
[1] My review of the appellate court's opinion shows it did not address the insurer's post-amendment misconduct as a basis for prospectively applying the amended version of La.Rev.Stat. § 22:658. Such analysis obviates the necessity of determining the character of the amendment and whether it can be applied retroactively.
[2] Because the plaintiff lived in the building that was insured under the commercial all-risk insurance policy, I do not see where this insurance contract was made for the gratification of a purely economic interest. Even though the insurance policy covered the plaintiff's business interest, it also covered his non-commercial interest in his home. See also n. 4 infra.
[3] I find La.Rev.Stat. § 22:1220 and La. Civ. Code art. 1998 must be read in pari materiae. As I appreciate these provisions, La.Rev.Stat. § 22:1220 grants a particular cause of action for general damages for the breach of an insurance contract and La. Civ.Code art. 1998 delineates the application of nonpecuniary damages, a discrete subset of general damages, awardable for the breach of the insurance contract.
[4] Although it is well recognized in Louisiana jurisprudence that the object of a contract of insurance is the payment of money, see e.g., Dixon v. First Premium Ins. Group, 05-0988 (La.App. 1 Cir. 3/29/06), 934 So.2d 134; Bye v. American Income Life Ins. Co., 316 So.2d 164 (La.App. 4 Cir.), writ denied, 320 So.2d 208 (La. 1975), the second paragraph of La. Civ.Code art. 1998 decidedly establishes a basis for the award of nonpecuniary damages "regardless of whether the object of one party's performance or the cause of the obligation of the other indicates that the contract was made for the gratification of nonpecuniary as well as pecuniary interest of one party." LITVINOFF, 6 LOUISIANA CIVIL LAW TREATISE: THE LAW OF OBLIGATIONS, § 6.16 at 176 (West Group 1999).
[1] Retired Judge Lemmie O. Hightower, sitting ad hoc for Calogero, C.J., recused.
[2] LSA-C.C.P. art. 970 provides, in pertinent part:

A. ... [A]ny party may serve upon an adverse party an offer of judgment for the purpose of settling all of the claims between them. The offer of judgment shall be in writing and state that it is made under this Article; specify the total amount of money of the settlement offer; and specify whether that amount is inclusive or exclusive of costs, interest, attorney fees, and any other amount which may be awarded pursuant to statute or rule....
....
C. ... [I]f the final judgment obtained against the defendant-offeree is at least twenty-five percent greater than the amount of the offer of judgment made by the plaintiff-offeror, the offeree must pay the offeror's costs, exclusive of attorney fees, incurred after the offer was made, as fixed by the court.
[3] See Aucoin v. Southern Quality Homes, LLC, 07-1014 (La.2/26/08), 984 So.2d 685, 697, citing Cajun Electric Power Co-operative, Inc. v. Owens-Corning Fiberglass Corporation, 616 So.2d 645 (La. 1993) (interest on court costs accrues from date of judgment).