CHARLES R. JONES, Judge.
|, This is a Hurricane Katrina case. The Appellant/Defendant, Essex Insurance Company (Essex), appeals the district court judgment awarding the plaintiffs damages under a contract of insurance for damages to immovable property. The Cross Appellants/Plaintiffs, J.R.A., Inc., doing business as Jaeger’s Seafood (J.R.A.) and Allen Jaeger, the owner of J.R.A., Inc., have filed a cross appeal seeking review of the judgment of the district court denying their motion for new trial for re-argument only regarding statutory penalties. For the reasons set forth below, we: (1) grant the motion of the appel-lees to amend the judgment of the district court, (2) amend the judgment of the district court, (3) affirm the judgment as amended, and (4) remand. We also deny the cross appeal of the appellees.
Essex issued a policy of insurance, No. 1-CH9224 [1], to J.R.A., as the sole insured, which covered damages to certain properties located at 1928 and 1904 West End Park in Orleans Parish. ' The subject policy allegedly covered damages arising out of a windstorm, but also allegedly excluded losses or damages for “flood, surface water, waves, tides, tidal waves, overflow of any body of water, or their spray, all whether driven by wind or not.”
1 gFor the property located at 1928 West End Park, the policy provided $600,000 Building Actual Cash Value (“ACV”) coverage and $100,000 Business Personal Property (“BPP” or contents) ACV coverage, both with 80% coinsurance requirements.
For the other property located at 1904 West End Park, the policy provided $100,000 Building ACV coverage with a 90% coinsurance requirement and $10,000 BPP ACV coverage with an 80% coinsurance requirement. The windstorm deductible was listed as $5,000.
Following Hurricane Katrina, which rendered both properties total losses, Ken Blum, J.R.A.’s insurance agent, prepared a Property Loss Notice dated September 6, 2005, and submitted it to Essex. As of September 29, 2005, Essex received the September 6, 2005 Property Loss Notice and initiated the claim adjustment process by assigning the claim to an independent adjuster.
On October 5, 2005, J.R.A.’s claim was assigned to Dreux Babin, an independent adjuster at Apple Adjusters, Inc. (“Apple Adjusters”). After receiving the claim and setting up the file, Mr. Babin called the contact for J.R.A., the Jackson-Vaughn Insurance Agency, on October 6, 2005. Essex then assigned the claim to an independent adjuster who attempted to make contact with J.R.A.’s contact person within 30 days of notice of the claim.
Unable to reach anyone at the Jackson-Vaughn Insurance Agency, Mr. Babin called again on October 13th, 25th, and 31st of 2005. On October 31, 2005, Mr. Babin was finally able to reach Mr. Blum at the Jackson-Vaughn Insurance Agency, and obtained contact information for Mr. Jaeger.
Mr. Babin attempted to contact Mr. Jae-ger on October 31st, November 3rd and *865 7th of 2005. Unable to reach Mr. Jaeger, Mr. Babin again followed up with |sMr. Blum at the Jaekson-Vaughn Insurance Agency for assistance on November 8, 2005. With the assistance of the Jaekson-Vaughn Insurance Agency, Mr. Babin was able to speak with Mr. Jaeger on November 8, 2005, and site inspections were set for November 10, 2005.
On that date, Mr. Babin conducted site inspections of the two building locations and took photographs. There was nothing left of either building except some pilings in Lake Pontchartrain at 1928 West End Park. During the inspections, Mr. Babin asked Mr. Jaeger for flood insurance information including the policies, coverages and amounts of recovery. Mr. Babin also asked Mr. Jaeger for relevant information regarding how the buildings were built; what they were made out of; the ages of the buildings; the square footage of the buildings; the plans and specifications for the buildings; pre-loss photographs of the interior and exterior of the buildings; and inventory lists of the BPP or contents along with supporting documentation (e.g., business records, audits, vendor receipts and tax records) to show the existence, value and age of the BPP.
On December 6, 2005, Mr. Babin followed up with Mr. Jaeger, who explained that he was having a hard time finding any documentation on either building. Additionally, although Mr. Jaeger admitted to recovering flood insurance money, he never sent Mr. Babin any of the flood insurance information. Mr. Babin again followed up with Mr. Blum at the Jaekson-Vaughn Insurance Agency to see if he could help Mr. Jaeger locate supporting documentation.
Since no structures remained at either site, Apple Adjusters, through Mr. Babin, retained Kevin Vanderbrook of VECO Consulting for engineering expertise. Based on his visual inspection of the building locations and observations of the surrounding area, Mr. Vanderbrook concluded that the cause of |4loss was a combination of storm surge and wind, but could not quantify the amount of wind damage to either building. As noted in his report, at the time of Mr. Vanderbrook’s January 30, 2006, inspection of the building locations, wind and storm surge information was not available. Mr. Vanderbrook also did not have access to any aerial or satellite photographs of either building; there were no drawings, plans, photographs, or any measurements of either building, nor had J.R.A. produced any flood insurance claim information. Mr. Vanderbrook explained that his January 31, 2006, report represented the best that he could offer given the limited information available to him at the time, but that the report was inconclusive in quantifying the amount of wind damage.
On February 10, 2006, Mr. Babin again followed up with Mr. Jaeger for information regarding the buildings. Again, Mr. Jaeger explained that he was having difficulty locating any building information.
On March 14, 2006, Mr. Babin finally received limited building information regarding 1928 West End Park. Specifically, Mr. Blum, on behalf of J.R.A., sent Mr. Babin a 1995 fire loss adjustment prepared by GAB Robins that purported to provide measurements for 1928 West End Park. Neither J.R.A. nor its insurance agent ever sent Mr. Babin any documentation regarding 1904 West End Park.
Based on the alleged lack of building and flood insurance recovery information from J.R.A., Mr. Babin was unable to quantify the wind damage to either building. However, after receiving VECO Consulting’s report, Mr. Babin made three preliminary recommendations: (1) make an unconditional tender of $50,000 for *866 building damage to 1928 West End Park; (2) make an unconditional tender of $10,000 for building damage to 1904 West End Park; and (3) retain Madsen, Knep-pers & Associates, Inc. (MK & A) for further analysis.
|¡¡Mr. Babin made the unconditional tender recommendations for building damage because VECO Consulting concluded that the building damage was caused by a combination of storm surge and wind, so there had to be some amount of wind damage. However, because VECO Consulting’s report was inconclusive regarding the amount of wind damage, the independent adjuster recommended seeking a more detailed analysis of the loss from MK & A. Nevertheless, Essex made the two suggested unconditional tenders of $50,000 and $10,000 to J.R.A., and retained MK & A.
Essex then contracted with Dave Van Derostyne, an expert in structural engineering with MK & A, a national engineering consulting firm, to determine the cause of loss and extent of the wind damage to both 1928 and 1904 West End Park. In reaching his conclusions regarding the cause of loss and extent of the wind damage, Mr. Van Derostyne gathered pre-loss aerial photographs, drawings and measurements and weather information (e.g., storm surge and wind data). Relying on this information, Mr. Van Derostyne concluded that, at the “closest point of approach” to the location of the two buildings, the estimated wind speed was 87 miles per hour (+/- 10 miles per hour), and the estimated storm surge was 7.4 feet (+/- 4 feet). The wave action increased the estimated height of the storm surge by 4 to 5 feet — to approximately 11.4 to 12.4 feet (+/- 4 feet). He also opined that the storm surge plus wave action put the water in 1928 West End Park at approximately 8 feet above floor level, and in 1904 West End Park at approximately 10 feet above floor level. He further concluded that “[wjater definitely contributed to the destruction of these buildings.”
|fiUsing the highest estimated wind speed in CompuWeather’s[2] range of estimated wind speeds at the “closest point of approach” of 97 miles per hour, Mr. Van Derostyne opined that the available data would place Hurricane Katrina in the high CAT 1 or low CAT 2 range.
Mr. Van Derostyne further opined that as to 1928 West End Park, that:
[Wje believe that minor roof damage occurred along the north elevation, which was the elevation that’s more exposed to the elements in open water. Primarily, on the metal roof, there’s a portion of what we believe is the addition of a metal roof on to it. And we believe that occurred fairly early on, early in the morning hours, and that would start to cause water intrusion into the building at a fairly early stage in the storm.
Later on, as the storm develops, there’s mechanical units that were right in the middle of the building on the roof. We typically see that those units get damaged or destroyed or displaced. That would then allow further water to get into the building.
We also believe that the exterior glazing would start to be damaged, the windows, some of the siding. Interior water damage from all these breaches, we estimate it to be about 25 percent of the interior of the building would be water damaged based on the amount of rainfall *867 that we saw during that time and the amount of breaches that we expect to see in this building.
Regarding 1904 West End Park, Mr. Van Derostyne found that the structure had sustained similar wind damage as 1928 West End Park:
[W]e also expect to have minor to moderate roof damage. With this site here, it was very close to all of the trees. So, you expect some of tree branches and stuff like that falling on the roof causing further damage to the roof. Most of that would occur along the north elevation.
Similar to 1928, we would expect to see glazing damage, isolated for the most part. We estimate it’s approximately ten percent based upon the amount of windows that we saw on the outside of the building. And 17obviously water damage to the inside of that building from all these breaches and the substantial rainfall that was occurring.
Based on Mr. Van Derostyne’s structural engineering analysis, Mr. Patrick “Pete” Peters, Regional Manager of MK & A, prepared a Replacement Cost Valuation of each building and quantified the amount of wind damage to each building. Mr. Peters estimated the Replacement Cost Value (“RCV”) of 1928 West End Park at $3,062,696 and estimated the wind damage to 1928 West End Park at $397,350.70. He estimated the RCV of 1904 West End Park at $467,489.60, and estimated the wind damage to 1904 West End Park at $85,000.00. J.R.A.’s engineering expert opined “that the roof peeled off [1928 West End Park], caused the walls to collapse, and then the floodwaters came in later and washed the debris away, and that was the end of it.” He then concluded that the sole cause of loss for both locations was 100% wind.
Guided by the report of MK & A, the independent adjuster performed the appropriate co-insurance calculations provided in the policy for each building and made recommendations regarding unconditional tenders for covered damage to each building. Based on the co-insurance calculations, the independent adjuster recommended that Essex unconditionally tender a total of $108,653.58 building ACV for 1928 West End Park, and $18,431.84 building ACV for 1904 West End Park.
After deducting the previous unconditional tenders ($50,000 building for 1928 West End Park and $10,000 building for 1904 West End Park) from the independent adjuster’s recommendations, Essex unconditionally tendered an additional $67,058.42 Building ACV ($58,653.58 for 1928 West End Park and $8,431.84 for 1904 West End Park). Essex made these additional unconditional |8tenders in accord with the independent adjuster’s recommendations, and despite J.R.A.’s continued failure to produce the flood insurance recovery and other requested information.
After his May 19, 2006 report was delivered to Essex, Mr. Babin received a letter from JRA’s attorney dated June 8, 2006, that purported to list the BPP located in each building at the time of Katrina. The letter explained: “Allen [Jaeger] will supplement this list by adding the approximate dates when the items were acquired, which I will also forward to you.” However, neither Mr. Jaeger nor J.R.A.’s attorney ever supplemented this information by providing Mr. Babin with the ages of the alleged BPP. Again, JRA failed to provide Essex with information necessary to properly adjust the claim. Moreover, Mr. Jaeger prepared handwritten lists of the BPP allegedly contained in each building at the time of Katrina. The information in the lists came strictly from Mr. Jaeger’s memory. He had no inventory lists, no *868 auditing information from a CPA, no tax records and no other paperwork that would assist in corroborating the information in the inventory lists.
Additionally, while the pricing information contained in the lists also came from Mr. Jaeger’s memory, the pricing information provided by Mr. Jaeger was the “fair market value as of the date of loss” for each item. However, as averred by Essex, Mr. Jaeger probably misunderstood the policy, since the pricing information was to be “at actual cash value.”
Despite the absence of corroborating information, Mr. Babin utilized the lists provided by Mr. Jaeger. After taking into account depreciation, duplicative items, coinsurance penalties, non-covered items, and previous payments, Mr. Babin determined that J.R.A. was not entitled to recover any additional amounts for its BPP located at 1928 and 1904 West End Park.
^Subsequently, on August 25, 2006, J.R.A. filed suit in the Civil District Court for the Parish of Orleans, seeking to recover the face value of the policy of insurance, penalties, interest, and attorney’s fees.
Essex filed a notice of removal with the United States District Court, Eastern District, on August 31, 2007. Therein, Essex alleged that diversity existed between the parties. However, the U.S. District Court declined to exercise jurisdiction due to the case not meeting the minimum amount in controversy at the time the notice of removal was filed by Essex. The case was remanded to the Civil District Court for the Parish of Orleans pursuant to 28 U.S.C. § 1447(c)[3] on October 16, 2007.
The civil district court subsequently scheduled the matter for trial on the merits for September 9th, 10th, and 15th of 2009, via order dated January 14, 2009.
In the interim, Essex filed a motion for summary judgment on June 5, 2009. Therein, Essex argued that Mr. Jaeger was not named as an insured on the policy and should be removed as a named plaintiff from the lawsuit; that the subject buildings were underinsured; that Essex made unconditional tenders to J.R.A.; and to prevent double-recovery, Essex argued that it was entitled to an offset because of J.R.A.’s flood damage to the business personal property of the subject properties. However, the record indicates that the motion for summary judgment was subsequently continued without date.
A bench trial proceeded as scheduled on September 9th, 10th, and 15th of 2009. At the conclusion of trial, the district court awarded judgment in favor of 11ftthe J.R.A. and Mr. Jaeger, finding that Essex had not sustained its burden of proving that J.R.A.’s losses were proximately caused by flooding, which was excluded under the insurance policy.[4] Accordingly, the district court awarded J.R.A. the remainder of the policy limits for 1928 West End and 1904 West End Park, plus legal interests and costs.
*869 However, also based on the law and the evidence presented at trial, the district court concluded that J.R.A. could not recover under the amended versions of La. R.S. 22:658 or La. R.S. 22:1220, because the alleged conduct giving rise to the bad faith claim occurred prior to the amendment of the statutes. Specifically, the district court noted that J.R.A. alleged in the Petition that Essex was in bad faith prior to the filing of the Petition on August 25, 2006. By making this allegation in the Petition and considering the date that the Petition was filed, the court concluded that the law in effect at the time the alleged bad faith occurred (at least 30 days prior to the filing date) was the pre-amendment versions of former La. R.S. 22:658 and 22:1220. Thus, J.R.A.’s own pleadings placed the alleged bad faith within the pre-amendment versions of La. R.S. 22:658 and 22:1220, which did not allow for the recovery of attorney’s fees. Rejecting J.R.A.’s claim for statutory penalties under the pre-amendment versions of La. R.S. 22:658 and 22:1220, the district court held that, “based on the evidence presented, the Court believes that Essex Insurance Company was not acting arbitrarily or capriciously].” Thus, the district court rejected J.R.A.’s bad faith claim against Essex, holding that “plaintiffs are not entitled to penalties and attorney’s fees as set forth in La. R.S. 22:1892 (the former La. R.S. 22:658) and the former La. R.S. 22:1220.”
lnFollowing the issuance of the December 16, 2009, Judgment, J.R.A. filed its Motion for New Trial, which sought a new trial solely with respect to the district court’s rejection of its bad faith claim under former La. R.S. 22:658 and 22:1220. Notably, J.R.A. did not raise any arguments regarding the propriety of the application of the pre-amendment versions of La. R.S. 22:658 and 22:1220. In the Motion for New Trial and at the March 12, 2010 hearing on same, J.R.A. asserted that Essex ignored the January 31, 2006 report of Mr. Vanderbrook — Essex’s own expert — and secured “another engineering report obviously for the purpose of obtaining a report favorable to rejection of coverage.” However, the district court rendered judgment on March 23, 2010, concluding that J.R.A. was not entitled to a new trial.
Timely appeals of the judgments dated December 16, 2009 and March 23, 2010 followed.

I.The Appeal by Essex

In the instant appeal, Essex raises (5) assignments of error:
1. The district court erred in failing to perform the necessary calculations under the coinsurance provision to determine the amount of covered damage to the 1928 West End Park Building and 1904 West End Park Building when it was stipulated that both properties were underinsured.
2. The district court erred in failing to perform the necessary calculations under the coinsurance provision to determine the amount of covered damage to the business personal property located at 1928 and 1904 West End Park.
3.' The district court erred in failing to account for depreciation for the contents located at 1928 and 1904 West End Park.
4. The district court erred in failing to offset the amounts paid by J.R.A.’s flood carrier and excluded under the Policy.
5. The district court erred in failing to determine the damages caused by wind versus storm surge.
| ijjWe note that La. C.C.P. art. 2129 provides that an assignment of errors is *870 not necessary in any appeal. Furthermore, La. C.C.P. art. 2124 gives the appellate court authority to “render any judgement which is just, legal, and proper upon the record on appeal.” Based on these codal authorities, we hold that an appellate court has the authority to consider an issue [on appeal and of record] even when there is no assignment of error. Nicholas v. Allstate Ins. Co., 99-2522, pp. 7-8 (La.8/31/00), 765 So.2d 1017, 1022-1023; Georgia Gulf Corp. v. Board of Ethics for Public Employees, 96-1907, pp. 5-6 (La.5/9/97), 694 So.2d 173, 176. Therefore, considering the above principles, we note that the judgment which is the subject of the instant appeal appears to cast Mr. Jaeger in judgment. We further note that in considering the post-argument briefs of counsel, and the motion to amend judgment, the parties have agreed that Mr. Jaeger should not be cast in judgment. Therefore, while we affirm the judgment, we amend the judgment so as to only cast J.R.A. in judgment, and remove Mr. Jae-ger from the judgment.

DISCUSSION

It is well settled that an appellate court may not disturb a trial court’s findings of fact unless the record establishes that a factual, reasonable basis does not exist and the finding is clearly wrong or manifestly erroneous. Clarkston v. Louisiana Farm Bureau Cas. Ins. Co., 07-0158, 07-1282, p. 24 (La.App. 4 Cir. 7/2/08), 989 So.2d 164, 182, writ denied, 08-1768 (La.10/31/08), 994 So.2d 539 (citing Syrie v. Schilhab, 96-1027 (La.5/20/97), 693 So.2d 1173, 1176). Upon full review of the record, the appellate court may not reverse reasonable findings, even if convinced it would have weighed the evidence differently sitting as the trier of fact. Id.
| ]SLa. R.S. 22:1892[5], entitled Payment and adjustment of claims, policies other than life and health and accident; personal vehicle damage claims; penalties; arson-related claims suspension, provides:
A. (1) All insurers issuing any type of contract, other-than those specified in R.S. 22:1811, 1821, and Chapter 10 of Title 23 of the Louisiana Revised Statutes of 1950, shall pay the amount of any claim due any insured within thirty days after receipt of satisfactory proofs of loss from the insured or any party in interest. The insurer shall notify the insurance producer of record of all such payments for property damage claims made in accordance with this Paragraph.
(2) All insurers issuing any type of contract, other than those specified in R.S. 22:1811, R.S. 22:1821, and Chapter 10 of Title 23 of the Louisiana Revised Statutes of 1950, shall pay the amount of any third party property damage claim and of any reasonable medical expenses claim due any bona fide third party claimant within thirty days after written agreement of settlement of the claim from any third party claimant.
(3) Except in the case of catastrophic loss, the insurer shall initiate loss adjustment of a property damage claim and of a claim for reasonable medical expenses within fourteen days after notification of loss by the claimant. In the case of catastrophic loss, the insurer shall initiate loss adjustment of a property damage claim within thirty days after notification of loss by the claimant except that the commissioner may promulgate a rule for extending the time period for initiating a loss adjustment for damages arising from a presidentially declared emer *871 gency or disaster or a gubernatorially declared emergency or disaster up to an additional thirty days. Thereafter, only one additional extension of the period of time for initiating a loss adjustment may be allowed and must be approved by the Senate Committee on Insurance and the House Committee on Insurance, voting separately. Failure to comply with the 114provisions of this Paragraph shall subject the insurer to the penalties provided in R.S. 22:1973.
(4) All insurers shall make a written offer to settle any property damage claim, including a third-party claim, within thirty days after receipt of satisfactory proofs of loss of that claim.
B. (1) Failure to make such payment within thirty days after receipt of such satisfactory written proofs and demand therefor or failure to make a written offer to settle any property damage claim, including a third-party claim, within thirty days after receipt of satisfactory proofs of loss of that claim, as provided in Paragraphs (A)(1) and (4), respectively, or failure to make such payment within thirty days after written agreement or settlement as provided in Paragraph (A)(2), when such failure is found to be arbitrary, capricious, or without probable cause, shall subject the insurer to a penalty, in addition to the amount of the loss, of fifty percent damages on the amount found to be due from the insurer to the insured, or one thousand dollars, whichever is greater, payable to the insured, or to any of said employees, or in the event a partial payment or tender has been made, fifty percent[6] of the difference between the amount paid or tendered and the amount found to be due as well as reasonable attorney fees and costs. Such penalties, if awarded, shall not be used by the insurer in computing either past or prospective loss experience for the purpose of setting rates or making rate filings.
(2) The period set herein for payment of losses resulting from fire and the penalty provisions for nonpayment within the period shall not apply where the loss from fire was arson related and the state fire marshal or other state or local investigative bodies have the loss under active arson investigation. The provisions relative to time of payment and penalties shall commence to run upon certification of the investigating authority 11sthat there is no evidence of arson or that there is insufficient evidence to warrant further proceedings.
[[Image here]]
C. (1) All claims brought by insureds, worker’s compensation claimants, or third parties against an insurer shall be paid by check or draft of the insurer to the order of the claimant to whom payment of the claim is due pursuant to the policy provisions, or his attorney, or upon direction of such claimant to one specified; provided, however, that the check or draft shall be made jointly to the claimant and the employer when the employer has advanced the claims payment to the claimant. Such check or draft shall be paid jointly until the amount of the advanced claims pay *872 ment has been recovered by the employer.
(2) No insurer shall intentionally or unreasonably delay, for more than three calendar days, exclusive of Saturdays, Sundays, and legal holidays, after presentation for collection, the processing of any properly executed and endorsed check or draft issued in settlement of an insurance claim. [Emphasis supplied.]
In addition, La. R.S. 22:1893, entitled Claims involving immovable property, provides in pertinent part:
A. (1) No insurer shall use the floodwater mark on a covered structure without considering other evidence, when determining whether a loss is covered or not covered under a homeowners’ insurance policy.
[[Image here]]
B. If damage to immovable property is covered, in whole or in part, under the terms of the policy of insurance, the burden is on the insurer to establish an exclusion under the terms of the policy.
C. Any clause, condition, term, or other provision contained in any policy of insurance which alters or attempts to alter the burden on an insurer as provided in Subsection B of this Section shall be null and void and of no effect.
lujo. Any insurer determined to be in violation of the provisions of this Section shall be liable pursuant to R.S. 22:1973.[7]
In its first assignment of error, Essex argues that the district court erred in failing to perform the necessary calculations under the coinsurance provision to determine the amount of covered damage to the 1928 West End Park building and 1904 West End Park building when it was stipulated that both properties were underin-sured.
Essex argues that the district court disregarded the clear and unambiguous terms of the Policy mandating that the failure of J.R.A. to satisfy the coinsurance provisions of the Policy reduced the covered damages under the Policy. Further, Essex argues that the judgment of the district court contains no coinsurance analysis, notwithstanding the admission of J.R.A., that both the buildings and contents were underin-sured.
Essex further argues that the district court also failed to account for depreciation in its award, thereby misapplying the term “actual cash value,” and failed to determine what business personal property was excluded from coverage.
Essex argues that the district court also erred by allowing J.R.A. to argue that its damages were caused 100% by Hurricane Katrina’s winds, as opposed to a combination of wind damage and storm surge, and failing to determine what damages were caused by wind versus storm surge. Lastly, Essex argues that the recovery of J.R.A. of over $900,000 from the National Flood Insurance Program (“NFIP”) for the same damages to property, creates an impermissible windfall, and that any award of damages should be offset by this amount.
117Essex also argues that “coinsurance” is called for by a provision imposing an obligation upon the insured to keep a specific amount or a percentage of additional insurance in force, failing which he or she becomes a coinsurer to the extent of the omitted insurance.[8] Stated otherwise, the term “coinsurance” denotes a relative division of the risk between the insurer and *873 the insured, depending upon the relative amount of the policy and the actual value of the property insured.
Essex argues that in practice, such a provision imposes an obligation upon the insured to maintain a specific amount or percentage of insurance, failing which he or she becomes a coinsurer to the extent of any deficit. Here, the Declarations Page of the Policy indicates that J.R.A. was required to maintain coverage equal to 80% of the actual cash value of 1928 West End Park building and 90% of the actual cash value of 1904 West End Park building. Particularly, Essex argues that if J.R.A. failed to maintain appropriate coverage, it would incur a coinsurance penalty in the event of a covered loss. There was no dispute that both buildings and contents were underinsured, thereby triggering the Policy’s coinsurance penalty.
The testimony of the expert of Essex (Mr. Vanderbrook) was that the RCV of 1928 West End Park was $3,062,696. Thus, after applying depreciation to the RCV to determine the ACV, J.R.A. was required to carry $1,851,797.60 in insurance coverage to avoid the coinsurance penalty, but carried only $600,000.
Essex argues that there is no dispute that both 1928 West End Park and 1904 West End Park were underinsured; thus, the coinsurance penalty provision of the Policy was implicated. And, because the coinsurance formula requires a determination of the percentage of damages attributable to covered losses, the 11sdistrict court necessarily had to determine what amount of damages were attributable to flood and what amount was attributable to wind. Essex offered expert testimony that 1928 West End Park sustained $338,436.98 in wind damage, and 1904 West End Park sustained $77,185.28 in wind damage. Essex noted that in rebuttal, J.R.A.’s experts testified that all damage to 1928 West End Park and 1904 West End Park was related to wind, and that the structures and contents were completely destroyed prior to any flooding. Thus, despite receiving a substantial flood recovery, J.R.A. maintained that the quantification of the amount of wind damage to 1928 West End Park was $3,277,262.80 and $465,235.00 to 1904 West End Park — the full value of the structures.
Essex points out that in its judgment, the district court implicitly acknowledged problems with J.R.A.’s argument, especially in light of J.R.A.’s flood recovery (the district court concluded that J.R.A.’s previous award of flood damages did not constitute a double recovery) thereby acknowledging that at least some of J.R.A.’s damages were caused by flood. In finding that the buildings sustained damages attributable to a combination of wind and flood (consistent with the testimony provided by Essex’s experts), the district court rejected J.R.A.’s position that all of the losses were caused by wind, but still determined that J.R.A. was entitled to the remainder of the policy limits on both buildings.
Despite arguing that both of the buildings were underinsured, Essex now argues that the district court erroneously failed to perform the coinsurance calculations. The district court did not provide its determination of the value of either of the buildings, nor did the district court provide its determination of the amount or percentage of wind-related damage to both properties. Essex argues that instead, the district court ignored the coinsurance provision and the testimony of 119the experts of Essex altogether, and simply awarded the remainder of the policy limits on both buildings. Essex maintains that it is not clear from the district court’s judgment what its ultimate determination was regarding the wind-related damage to either *874 1928 West End Park or 1904 West End Park, and, that this failure to quantify the amount of wind-related damage and the failure to perform the coinsurance calculation constitutes reversible error.
J.R.A. argues that the position of Essex is simply not true and is misleading. They argue that the district court was thoroughly aware of both the methodology spelled out in Essex’s policy, and the “necessary calculations” needed to determine what effect, if any, the coinsurance provisions had on the insured’s entitlement to coverage benefits, and that those subjects were the focus of conferences and memoranda which now form part of the record of this case.
J.R.A. argues that the district court also knew that before the methodology was undertaken, it was necessary to make a factual finding of the amount of loss/damage to the insured’s property, from a covered loss (i.e., wind), because it was the most essential element in computing recoverable losses under coinsurance policies.
J.R.A. further argues that the coinsurance methodology for 1928 West End Park, as explained in the policy of insurance, may be applied in two ways: 1) by using flood damage which was estimated by Mr. Peters and Mr. Van Derostyne, and whereby they concluded that the only wind damage was $338,438.98, and 2) where the calculation assumed that since Essex failed to carry its burden of proving that any damage was caused by flooding, it was necessary to use the entire ACV of 1928 West End Park, $2,314.747 as the amount of loss due to wind, the covered peril.
1 j.nThe district court also heard the testimony of meteorologist expert Mr. John S. Cordero. During the trial, Mr. Cordero testified that he relied on no less than twelve local and national weather sources to calculate and reconstruct the timeline and extent of Hurricane Katrina’s force winds. Mr. Cordero testified that the severe winds, far in excess of hurricane forces, impacted the plaintiffs properties at least nine hours before the flood surge.
J.R.A. argues that the district court also relied on the testimony of its duly accepted civil and structural engineering expert, Mr. Roy Carubba, whose expertise includes all aspects of commercial, residential and industrial buildings. His experience included involvement in more than five thousand designs, analyses, or inspections of buildings in the Gulf Coast region. He also has a general contractor’s license.
Mr. Carubba testified that through his pre-Katrina experience,[9] he knew that 1928 West End Park was at least fifty years old, that it was made entirely of wood, and probably did not contain weather protection features now required by building codes to prevent destruction of buildings from wind forces, such as straps and metal clips that bind and hold the roof to the walls, and prevent the roof from being blown away.
It was his firm opinion, without hesitation, that the efficient cause of the destruction of both 1928 West End Park and 1904 West End Park was Katrina’s wind forces, ranging from 110 to 135 miles which, as proven by Cordero’s testimony, had battered the buildings for nine hours before the onset of flood surges. J.R.A. argues that the testimony of Mr. Carubba also provided additional |21evidence that Essex failed to carry its burden of proving that only a portion of the insured property was damaged or lost by wind forces.
*875 In the instant matter, it is alleged that Essex is liable under the provision of La. R.S. 22:1893(B), which states:
If damage to immovable property is covered, in whole or in part, under the terms of the poliey of insurance, the burden is on the insurer to establish an exclusion under the policy.
In Frught v. Lafayette Insurance Co., 09-0476 (La.App. 4 Cir. 9/30/09),[10] 2009 WL 4722680, writ granted Frught v. Lafayette Ins. Co., 09-2361 (La.1/29/10), 27 So.3d 270, the plaintiff filed suit against her homeowner’s insurer, Lafayette Insurance Company (“Lafayette”), seeking the amount of her full policy limits for property damage sustained to her home during Hurricane Katrina. The plaintiff filed a motion for partial summary judgment, arguing that Lafayette owed her the entire value of her homeowner’s policy pursuant to La. R.S. 22:695(A)(1), the Louisiana Valued Policy Clause. Lafayette filed a cross-motion for partial summary judgment, arguing that it is entitled to an offset for the amount plaintiff received from her flood insurer.
The district court granted plaintiffs motion for summary judgment, and denied Lafayette’s motion for summary judgment. Upon Lafayette’s writ application, a five-judge panel of this Court, in a split decision, granted the writ, reversed the summary judgment rendered in favor of the plaintiff, and granted summary judgment in favor of Lafayette.[11] Thus, Lafayette was granted an offset.
_[2gHowever, the Supreme Court, granted certiorari to Ms. Frught and, in its Per Curiam determined that:
In Landry v. Louisiana Citizens Property Ins. Co., 07-1907, 07-1908 at p. 14 (La.5/21/08), 983 So.2d 66, 80, we explained that the language of the Louisiana Valued Policy Clause “clearly provides that if an insurer places a value on covered property and uses that valuation to determine the premium charged the insured, in the case of total loss the insurer shall compute and compensate any covered loss of the property at that valuation without deduction or offset unless a different method of loss computation is set forth in the policy and policy application in type of equal size.” [emphasis added]. Although the district court recognized that it appears Lafayette’s policy contained the same “actual cash value” provision as the policy at issue in Landry, the court concluded there were questions of fact as to whether the policy application contained this language. In light of this factual dispute, summary judgment in favor of Lafayette is inappropriate.
Frught, 2009-2361, *1-2, (La.1/29/10), 27 So.3d at 271.
Our review of the record in this matter indicates that the district court’s judgment in favor of J.R.A. for the properties situated at 1928 West End Park and 1904 West End Park in the amount of $565,914.58 for the property losses, plus legal interest and costs was correct. In reaching the judgment value, the district court calculated the total policy limits on *876 both properties ($700,000), less the payments already made by Essex ($127,085.42), less the deductible ($5,000). Therefore, we conclude that the judgment of the district court was not manifestly erroneous, nor clearly wrong, and that this assignment of error is without merit.
In its second assignment of error, Essex argues that the district court erred in failing to perform the necessary calculations under the coinsurance provision to determine the amount of covered damage to the business personal property located at 1928 and 1904 West End Park.
12?,Essex argues that the district court’s award of the remainder of the BPP policy limits on 1928 and 1904 West End Park constitutes manifest error for four reasons: (1) it failed to account for amounts that should be excluded because they were not BPP; (2) it failed to account for depreciation; (3) it failed to account for the applicable coinsurance penalty; and (4) it failed to offset the amounts previously received from J.R.A.’s flood carrier for the exact same contents list.
At the trial of this matter, Essex argued that it presented evidence demonstrating that:
• $203,175 of the items contained on the 1928 BPP list and $14,806 of the items contained on the 1904 BPP list were excluded under the terms of the Policy;
• The 1928 West End Park list should be reduced by an additional $84,544 to account for depreciation, and the 1904 West End list should be reduced by an additional $14,638;
• The application of the co-insurance penalty reduces the amount of recoverable damages significantly; and
• J.R.A. submitted identical content lists to its flood and wind carrier and recovered $303,900 on 1928 West End Park and $31,300 on 1904 West End Park, from its flood carrier.
Essex now argues that in awarding J.R.A. policy limits for 1928 and 1904 West End Park, the district court did not offer any explanation for its failure to account for any of these issues. Essex argues that although the district court did not reject any of its arguments, but, similar to the coinsurance calculation, the district court simply failed to address them. Essex argues that the amounts attributable to excluded items, depreciation, coinsurance, and offset were significant issues and should have reduced J.R.A.’s recovery to well below the insurance policy limits.
| ^Furthermore, Essex argues that the district court even acknowledged that “offset would be appropriate if the Court’s award constituted a double recovery.” Essex also argues that the district court further indicated that because the value of the buildings was $2,779,982, the recovery from both the wind and flood carriers did not constitute double recovery. While Essex does not agree with the district court’s findings in this regard, there is no finding at all regarding the purported double recovery for the contents (BPP) at 1928 and 1904 West End Park.
J.R.A. argues that Essex actually owes an additional $110,000. They argue that Essex failed to carry its burden of proving by clear and convincing evidence that the district court committed reversible error in his award to plaintiff for BPP which was destroyed by Katrina’s wind forces.
In addition, J.R.A. argues that Essex failed totally to sustain its burden of proving, with a fair amount of certainty, evidence which excluded every other reasonable explanation. See Carter v. City Parish Government of E. Baton Rouge, 423 So.2d 1080 (La.1982); Lacey v. Louisiana Coca-Cola Bottling Company Ltd., 452 So.2d 162 (La.1984); Brooks v. State *877 Farm Mutual Automobile Ins. Co., 03-0389 (La.App. 4 Cir. 9/24/03), 855 So.2d 419.
We find that the intent of the district court was to award J.R.A., Inc., the policy limits of each policy in the respective amounts of $600,000 for the 1928 West End Park building and $100,000 for the contents of that building and $100,000 for the 1904 West End Park building, and $10,000 for the contents of that building, subject to a credit of the amounts previously paid by Essex.
In pertinent part, the Essex insurance policy provides the following relative to coinsurance:
1¾1. Coinsurance
If a Coinsurance percentage is shown in the Declarations, the following condition applies.
a. We will not pay the full amount of any loss if the value of Covered Property at the time of loss times the Coinsurance percentage shown for it in the declarations is greater than the Limit of Insurance for the property.
Instead, we will determine the most we will pay using the following steps:
(1) Multiply the value of Covered Property at the time of loss by the Coinsurance percentage;
(2) Divide the Limit of Insurance of the property by the figure determined in step (1);
(3) Multiply the total amount of loss, before the application of any deductible, by the figure determined in step (2); and
(4) Subtract the deductible from the figure determined in step (3).
We will pay the amount determined in step (4) or the limit of insurance, whichever is less. For the remainder, you will either have to rely on other Insurance or absorb the loss yourself.
Example No. 1 (Underinsurance):
When:
The value of the property is $250,000
The Coinsurance percentage for it is 80%
The Limit of Insurance for it is $100,000
The Deductible is $ 250
The amount of loss is $ 40,000
Step (1): $250,000 X 80% = $200,000 (the minimum amount of Insurance to meet your Coinsurance requirements)
Step (2): $100,000 +• $200,000 = .50
Step (3): $40,000 x .50 = $20,000
Step (4): $20,000 - $250 = $19,750
We will pay no more than $19,750. The remaining $20,250 is not covered.
Example No. 2 (Adequate Insurance):
■When:
The value of the property is: $250,000
The Coinsurance percentage for it is 80%
The Limit of Insurance for it is $200,000
The Deductible is $ 250
The amount of loss is $ 40,000
The minimum amount of Insurance to meet your coinsurance requirement is $200,000 ($250,000 x 80%). Therefore, the Limit of Insurance in this Example is adequate and no penalty applies. We will pay no more than $39,750 ($40,000 amount of loss minus the deductible of $250).
b. If one Limit of Insurance applies to two or more separate items, this condition will apply to the total of all property to which the limit applies.
Example No. 3:
When:
The value of property is:
Bldg, at Location No. 1 $ 75,000
Bldg, at Location No. 2 $100,000
Personal Property at Location No. 2 $ 75,000
$250,000
The Coinsurance percentage for it is 90%
The Limit of Insurance for Buildings and Personal Property at Location Nos. 1 and 2 is $180,000
The Deductible is $ 1,000
The amount of loss is:
Bldg, at Location No. 2 $ 30,000
Personal Property at Location No. 2 $ 20,000
$ 50,000
Step (1): $250,000 x 90% = $225,000
(the minimum amount of Insurance to meet your Coinsurance requirements and to avoid the penalty shown below)
*878 Step (2): $180,000 -h $250,000 = .80
Step (3): $50,000 x .80 = $40,000
Step (4): $40,000 - $1,000 = $39,000.
The remaining $11,000 is not covered.
If one makes the calculations using the formula provided in the policy and making appropriate assumptions relating to windstorm damage, the co-insurance clause results in Essex being required to pay policy limits. That is, if most of the damage is due to windstorm, the calculation results in policy limits being due by |27Essex to J.R.A., Inc. The district court’s conclusion is neither manifestly erroneous nor clearly wrong when one reads the record in these proceedings.
The record before us provides that as to the claim of J.R.A. for the BPP loss, neither side disputes that the total loss on 1928 West End Park exceeds the $100,000 policy limit. This finding is consistent with the findings of the district court. The same holds true for the BPP loss at 1904 West End Park. At that location, the BPP loss exceeds the $10,000 policy limit.
In its reasons for judgment, the district court noted:
... neither side disputes the total loss on 1928 West End Park exceeds the $100,000 policy limit. The same holds true for the Business Personal Property loss at 1904 West End Park. At that location, the Business Property loss exceeds the $10,000 policy limit. Thus the plaintiffs are only entitled to recover $110,000 total for Business Personal Property loss.
Thus, the judgment of the district court was not manifestly erroneous nor clearly wrong in concluding that J.R.A. was only entitled to recover $110,000 total for the BPP loss.
In its third assignment of error, Essex argues that the district court erred in failing to account for depreciation for the contents located at 1928 and 1904 West End Park. Essex argues that the district court erred in failing to account for any depreciation. The Policy is an ACV policy and thus depreciation must be taken into account. Mr. Jaeger admitted that he failed to give Essex the ages of his alleged BPP losses and that he would only be guessing at the age of any of the contents, which required that Mr. Babin make an educated guess on depreciation.
Relying on Mr. Babin’s experience as an insurance adjuster with knowledge that J.R.A. replaced all of its BPP at 1928 West End Park after a 1995 fire, Mr. Babin testified that he assumed that the BPP was at least 10 years old at the time of | ¡^Katrina, and the deprecation would have to be at least 20%. However, it is not uncommon for restaurant equipment to depreciate by 40%. Essex argues that applying 20% depreciation reduces the alleged BPP in 1928 West End Park to $338,176 ACV. Also, as argued by Essex, given the amount of J.R.A.’s flood recovery, coupled with the failure to account for depreciation, excluded items, and coinsurance, Essex argues that the district court committed reversible error by awarding J.R.A. more than it was entitled to recover for the contents loss at 1928 and 1904 West End Park.
J.R.A. argues that even after applying the 20% depreciation of all movable BPP remaining, after having first excluded altogether those items which Mr. Babin said were not properly BPP, the values of the remaining property (when calculated according to the coinsurance methodology described in Essex’s policy) still resulted in Essex owing J.R.A. the policy limits of coverage for BPP located in both 1928 and 1904 West End Park.
We agree, as this finding is consistent with the findings of the district court. *879 Therefore we conclude that this assignment of error is without merit.
In its fourth assignment of error, Essex argues that the district court erred in failing to offset the amounts paid by J.R.A.’s flood carrier and excluded under the policy. Essex argues that the district court did not address the recovery of $303,900 by J.R.A. from its flood carrier for its BPP losses at 1928 West End Park, or its recovery of $31,300 for damage to contents at 1904 West End Park. Mr. Jaeger testified that he submitted identical contents lists to both his flood and wind carrier.
All of the damage to the BPP allegedly in 1928 West End Park ($338,176 ACV) was not caused by wind, especially considering the undisputed fact that the | 2qNFIP paid $303,900 for flood damage to BPP at 1928 West End Park. Thus, the recovery under the Policy, if any, “is subject to offset by payments received under flood insurance policies.” See, Albert v. Farm Bureau Insurance Company, 05-2496, p. 4 (La.10/17/06), 940 So.2d 620, 622 (“Louisiana law does not allow for double recovery of the same element of damages.”); Gagnard v. Baldridge, 612 So.2d 732, 736 (La.1993) (“Double recovery would be in the nature of exemplary or punitive damages which are not allowable under Louisiana law unless expressly provided for by statute.”).
Because of the jurisprudence prohibiting double recovery, Essex argues that J.R.A. cannot dispute that at least some of its contents loss at 1904 West End Park ($58,556 ACV) was caused by flood, given that NFIP paid J.R.A. $31,300. Additionally, Essex argues that the district court failed to even address the offset for the amounts that J.R.A. already recovered for the same contents from its flood carrier. It is universally agreed that the fundamental purpose of property insurance contracts is indemnity. See Wright v. Assurance Co. of America, 31,578, p. 3 (La.App. 2 Cir. 2/24/99), 728 So.2d 974, 975. The concept of indemnity is directed at restoring the insured to the position he or she occupied prior to the loss; “[hjence, both the extent and the limitation of recovery is found in the concept of making good the loss which the insured has sustained.” [12] Furthermore, Essex argues that it has long been understood that an insured is entitled to receive only the amount that will indemnify actual loss, not an additional windfall above this amount.
Additionally, Essex argues that numerous courts which have addressed the issue in other Hurricane Katrina cases have expressly rejected the double recovery regime that occurred here when J.R.A. was awarded policy limits for identical | ¡^contents from both its flood and wind carriers. See Ferguson v. State Farm Ins. Co., 06-3936, 2007 WL 1378507 at *4 (E.D.La. May 9, 2007); Esposito v. Allstate Ins. Co., 06-1837, 2007 WL 1125761 (E.D.La. Apr.16, 2007).
The district court even acknowledged that “offset would be appropriate if the Court’s award constituted a double recovery.” The district court further noted that because the value of the buildings was $2,779,982, the recovery from both the wind and flood carriers did not constitute double recovery. While Essex does not agree with the district court’s findings, Essex argues that there is no finding at all regarding the double recovery for the contents at 1928 and 1904 West End Park.
Essex argues that given the amount of the flood recovery of J.R.A., coupled with *880 the failure to account for depreciation, excluded items, and coinsurance, Essex submits that the district court committed reversible error and awarded J.R.A. more than it was entitled to recover for the contents loss at 1928 and 1904 West End Park.
J.R.A. argues that there was no proof presented by Essex at trial, or in its brief, to carry its burden of proving that the flood carrier paid J.R.A. for the same items of BPP on which the District court based its total award of $110,000 for BPP located at both 1928 and 1904 West End Park.
J.R.A. argues that what was proven by Essex was the following:
1. Mr. Jaeger gave the same lists of BPP to both the adjusters for State Farm/NFIP and Essex.
2. In those lists (Plaintiffs Exhibits 12 and 13), the value of BPP contents at 1928 West End Park was declared to be $652,895, and the value of those at 1904 West End Park were stated to be $88,804, or a total for both buildings of $741,699.
3. The total settlement amount paid by State Farm/NFIP, for all contents loss was $344,200.00, being 13i $303,900.00 for those at 1928 West End Park and $31,300.00 for those at 1904 West End Park, a total of $344,200.00.
Thus, after subtracting the total received by J.R.A. from its flood insurer ($344,200) from the total value of contents ($741,699) lost, there was still a remaining value balance of $397,499, to apply to Essex’s $110,000 policy limits (the amount for which the district court held Essex liable).
In its reasons for judgment, the district court concluded J.R.A.’s “recovery from the Essex homeowner’s insurance policy and NFIP does [sic] not exceed the value of the properties,” and that recovery under the Essex policy and the NFIP was “permissible.” We agree and And that this assignment of error does not have merit.
In its fifth assignment of error, Essex argues that the district court erred in failing to determine the damages caused by wind versus storm surge. The district court stated that “none of defendant’s experts could state that 100% of the damages sustained by plaintiffs properties and the contents therein (or anything in the immediate vicinity) were caused solely by flood waters.”
Essex argues that it was not its burden to prove that the sole cause of loss was flood. Essex argues that it never urged such a position; rather, Essex insists that it always maintained that the losses of J.R.A. were caused by a combination of wind and storm surge, and provided expert testimony at trial to explain that combination.
The district determined that Essex did not prove it was “more likely than not” that “only a small percentage of plaintiffs damages were due to wind forces.” Essex argues, however, that the district court never fully determined what percentage of damage was attributable to wind forces, leaving one only to guess |o2that the damage attributable to wind forces was somewhere between “a small percentage” and “100%.” Absent this determination, Essex cannot determine its liability under the insurance policy for either building or contents damages. Moreover, as discussed above, a determination of wind versus storm surge damages is necessary to perform the required coinsurance calculations.
J.R.A. argues that Essex had the burden of proving that an exclusion in Essex’s policy, particularly flooding, was the cause of J.R.A.’s damages. Further, J.R.A. ar *881 gues that as the trier of fact, the district court found that Essex failed to carry its burden. It points to the reasons for judgment in support of its argument:
... [Mr.] Vanderbrook’s report stated that it was not possible to determine what damage was caused by wind versus flood waters. Defendant made a vain attempt to demonstrate that only a small percentage of plaintiffs [sic] damages was due to wind force. However, defendants proof did not rise to the level of “more likely than not.”
In light of the above, the Court finds that on or around August 29, 2005, the plaintiffs [sic] properties located at 1928 and 1904 West End Park were damaged by wind and rain forces which preceded the flood surge sustained by the properties.
J.R.A. argues that the phrase “satisfactory proof of loss” is not defined by any of the applicable statutes of the Insurance Code, and no specific form or protocol is mandated in Louisiana jurisprudence. Furthermore, it argues that an estimate of repair for a fire-damaged residence given by the contractor to the insurance adjuster was held to be satisfactory proof of loss under a homeowner’s policy as was the case in Sevier v. U.S. Fidelity & Guaranty Co., 497 So.2d 1380 (La.1986). A personal inspection of an insured’s property by an adjuster for the | ^insurance company also constitutes satisfactory proof of loss. See Paul v. Nat Am. Ins. Co., 361 So.2d 1281, 1285 (La.App. 1st Cir.1978).
Thus, considering the record before us, we cannot say that district court judgment as to this assignment of error was manifestly erroneous nor clearly wrong. Therefore, as to the appeal by Essex, the judgment of the district court is affirmed.
It is well settled that a court of appeal may not set aside a trial court’s or a jury’s finding of fact in the absence of “manifest error” or unless it is “clearly wrong,” and where there is a conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed on review, even though the appellate court may feel that its own evaluations and inferences are as reasonable. Where there are two permissible views of the evidence, the fact finder’s choice between them cannot be manifestly erroneous or clearly wrong. Appellate courts must constantly have in mind that their initial review function is not to decide factual issues de novo. When findings are based on determinations regarding the credibility of witnesses, the manifest error-clearly wrong standard demands great deference to the trier of fact’s findings; for only the fact finder can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener’s understanding and belief in what is said.
McCaskill v. Rosiere, 09-0323, p. 3 (La.App. 4 Cir. 8/24/09), 20 So.3d 496, 498-99.

The Cross Appeal by J.R.A.

J.R.A. filed a cross appeal in this matter, arguing that part of the judgment of the district court denying its Motion for New Trial for Reargument only, wherein J.R.A. moved to have the district court amend the judgment, and award J.R.A. statutory penalties and attorney fees for the arbitrary and capricious failure of Essex to pay the claims of J.R.A. within the thirty-day time limit mandated by Louisiana law.
|S4In the December 16, 2009 judgment, the district court found that J.R.A. did not meet its burden of proof in establishing that Essex acted arbitrarily and capriciously in denying full coverage benefits, and therefore J.R.A. was not entitled to statutory penalties and attorney’s fees.
*882 Louisiana Code of Civil Procedure article 1972 provides that a new trial shall be granted “[w]hen the verdict or judgment appears clearly contrary to the law and the evidence.” The Louisiana Supreme Court recently stated, however, that the jurisprudence interpreting article 1972 recognizes the trial court’s discretion in determining whether the evidence is contrary to the law and evidence. See Martin v. Heritage Manor South Nursing Home, 00-1023, p. 3 (La.4/3/01), 784 So.2d 627, 630. Even in light of this wide discretion of the trial court, that discretion is limited, as the trial court cannot freely interfere with any verdict with which it disagrees. Davis v. Wal-Mart Stores, Inc., 00-0445, p. 10 (La.11/28/00), 774 So.2d 84, 93. Furthermore, the Supreme Court stated:
[t]he discretionary power to grant a new trial must be exercised with considerable caution, for a successful litigant is entitled to the benefits of a favorable jury verdict. Fact finding is in the province of the jury, and the trial court must not overstep its duty in overseeing the administration of justice and unnecessarily usurp the jury’s responsibility. A motion for new trial solely on the basis of being contrary to the evidence is directed squarely at the accuracy of the jury’s factual determinations and must be viewed in that light. Thus, the jury’s verdict should not be set aside if it is supportable by any fair interpretation of the evidence.
Id. (citing Gibson v. Bossier City General Hospital, 594 So.2d 1332 (La.App. 2 Cir. 1991)). We have also stated the applicable standard of review in ruling on a motion for new trial is whether the trial court abused its discretion. Guillory v. Lee, 09-0075, p. 13 (La.6/26/09), 16 So.3d 1104, 1131.
IssLa. R.S. 22:1973, entitled Good faith duty; claims settlement practices; cause of action; penalties, provides in pertinent part:
A. An insurer, including but not limited to a foreign line and surplus line insurer, owes to his insured a duty of good faith and fair dealing. The insurer has an affirmative duty to adjust claims fairly and promptly and to make a reasonable effort to settle claims with the insured or the claimant, or both. Any insurer who breaches these duties shall be liable for any damages sustained as a result of the breach.
B. Any one of the following acts, if knowingly committed or performed by an insurer, constitutes a breach of the insurer’s duties imposed in Subsection A:
(1) Misrepresenting pertinent facts or insurance policy provisions relating to any coverages at issue.
(2) Failing to pay a settlement within thirty days after an agreement is reduced to writing.
(3) Denying coverage or attempting to settle a claim on the basis of an application which the insurer knows was altered without notice to, or knowledge or consent of, the insured.
(4) Misleading a claimant as to the applicable prescriptive period.
(5) Failing to pay the amount of any claim due any person insured by the contract within sixty days after receipt of satisfactory proof of loss from the claimant when such failure is arbitrary, capricious, or without probable cause.
(6) Failing to pay claims pursuant to R.S. 22:1893 when such failure is arbitrary, capricious, or without probable cause.
C. In addition to any general or special damages to which a claimant is entitled for breach of the imposed duty, the *883 claimant may be awarded penalties assessed against the insurer in an amount not to exceed two times the damages sustained or five thousand dollars, whichever is greater. Such penalties, if awarded, shall not be used by the insurer in computing either past or prospective loss [¡^experience for the purpose of setting rates or making rate filings.
D. The provisions of this Section shall not be applicable to claims made under health and accident insurance policies.
E. Repealed by Acts 1997, No. 949, § 2.
F. The Insurance Guaranty Association Fund, as provided in R.S. 22:2051 et seq., shall not be liable for any special damages awarded under the provisions of this Section.
The Supreme Court addressed the issue of appellate review related to arbitrary and capricious conduct of an insurer in Sher v. Lafayette Ins. Co., 07-2441, 07-2443 (La.4/8/08), 988 So.2d 186. In its opinion, the Supreme Court wrote:
The conduct prohibited in R.S. 22:658(A)(1) is virtually identical to the conduct prohibited in R.S. 22:1220(B)(5): the failure to timely pay a claim after receiving satisfactory proof of loss when that failure to pay is arbitrary, capricious, or without probable cause. The primary difference is the time periods allowed for payment. Furthermore, R.S. 22:658 and R.S. 22:1220 are penal in nature and must be strictly construed.
One who claims entitlement to penalties and attorney fees has the burden of proving the insurer received satisfactory proof of loss as a predicate to a showing that the insurer was arbitrary, capricious, or without probable cause. It logically follows from this burden that a plaintiff who possesses information that would suffice as satisfactory proof of loss, but does not relay that information to the insurer is not entitled to a finding that the insurer was arbitrary or capricious. The sanctions of penalties and attorney fees are not assessed unless a plaintiffs proof is clear that the insurer was in fact arbitrary, capricious, or without probable cause in refusing to pay. The statutory penalties are inappropriate when the insurer has a reasonable basis to defend the claim and acts in good-faith reliance on that defense. Especially when there is a reasonable and legitimate question as to the extent and causation of a claim, bad faith should not be inferred from an insurer’s failure to |37pay within the statutory time limits when such reasonable doubts exist.
Both R.S. 22:658 and R.S. 22:1220 require proof that the insurer was “arbitrary, capricious, or without probable cause,” a phrase that is synonymous with “vexatious.” This court has noted that “vexatious refusal to pay” means unjustified, without reasonable or probable cause or excuse. Both phrases describe an insurer whose willful refusal of a claim is not based on a good-faith defense.
Whether or not a refusal to pay is arbitrary, capricious, or without probable cause depends on the facts known to the insurer at the time of its action ... Because the question is essentially a factual issue, the trial court’s finding should not be disturbed on appeal absent manifest error. However, when the record does not support the trial court’s determination on this issue, the trial court’s decision will be reversed.
Sher v. Lafayette Ins. Co., 07-2441, 07-2443, pp. 26-27 (La.4/8/08), 988 So.2d 186, 206-07 (citing Reed v. State Farm Mut. Auto. Ins. Co., 03-0107 (La.10/21/03), 857 So.2d 1012, 1020-21.)
As previously stated, J.R.A. appeals the portion of the district court judgment de *884 nying its claim for penalties and attorney fees against Essex, as provided by La. R.S. 22:658. The amounts claimed by J.R.A. are fifty (50%) per cent of judgment value, for each, as provided by the 2006 Amendment to La. R.S. 22:658; or, alternatively, twenty five (25%) per cent thereof, as provided in the pre-2006 Amendment to the statute.
The twenty five (25%) per cent penalties and attorney fees provided in La. R.S. 22:658 were extant at the time of the plaintiffs losses in this case, which occurred on or about August 29, 2005. Both the percentages for attorney’s fees |38and penalties were increased to fifty (50%) per cent by the adoption of La. R.S. 22:658(A)(i), in the 2006 Special Session. Its effective date was July 15, 2006.[13]
The record herein establishes that suit was filed on August 26, 2006, but that it was not served upon the defendant until August 27, 2007. Louisiana jurisprudence holds that an insurer’s duty of good faith and fair dealing is a continuing tort, and continues until the insurer complies with its duty. Sher v. Lafayette Ins., 07-2441, 07-2443, p. 14 (La.4/8/08), 988 So.2d 186, 200.
J.R.A. argues that Essex has never satisfied its continuing duty, and accordingly, service of this suit on August 26, 2007 should be the date on which the then prevailing penalties and attorney fees provided by law are applied. Using the penalties and attorney fees which were in effect on that date, the fifty (50%) per cent penalties and attorney fees, which became effective on July 15, 2006 would be the proper amount to award.
However, again, the record before us indicates that after Hurricane Katrina, Mr. Jaeger notified Kenneth Blum, his insurance agent, and requested that he notify Essex that his properties were totally destroyed, and made a claim for his insurance benefits. Mr. Blum did so by submitting a “Property Loss” Notice to Essex Insurance Company dated September 6, 2005. Essex acknowledged receipt of the claim in two ways: 1) by response from Mike Van Huis, an Essex officer dated September 6, 2005; and 2) by acknowledgment of receipt of notice of the claim from Sue Hetgrick, another Essex officer, dated September 7, 2005. Thereafter, Essex hired Apple Adjusting Co., to investigate the claim. In turn, |S9Apple retained Kevin Vanderbrook,[14] P.E., owner of VECO Consulting, Inc., to conduct an inspection of the remains of J.R.A.’s properties. Mr. Vanderbrook was to conduct an investigation of the loss, and determine: 1) which damages had been caused by wind forces for which Essex would be liable under its policy, and 2) which damages had been caused by flooding, for which Essex would not be liable, since flooding was an excluded peril.
Mr. Vanderbrook visited the site, spoke with Mr. Jaeger, owner and C.E.O. of J.R.A., Inc., gathered as much evidence as he could, then submitted his written report, dated January 31, 2006.
J.R.A. argues that the report of Mr. Vanderbrook did not carry the burden of proof for Essex. They note that the engineering expert of Essex could not carry its statutory burden of proving that the damages claimed, or what parts thereof, were *885 caused by flooding, a policy exclusion. From that point, it was incumbent upon Essex to proceed to quantify and pay what was owed. Instead, as argued by J.R.A. and Mr. Jaeger, Essex ignored Mr. Van-derbrook’s report and may have begun “shopping” for a report which might provide it with some reason to deny coverage, or, at least, deny coverage for all damages sustained.
J.R.A. argues that considering the qualifications of Mr. Vanderbrook, his opinions are entitled to great weight. It was not until after the Vanderbrook report that Essex adjusters retained the services of MK & A,[15] the construction consulting firm that assigned two (2) structural engineers, Mr. Van Derostyne and Mr. Peters, to investigate J.R.A.’s claim, and according to Van Derostyne, “to address the issues relating to the damage to its buildings, as it relates to wind and flood surge.” 14nJ.R.A. further argue that these actions were taken by the adjusters of Essex to perform the same investigation for which Mr. Van-derbrook had been retained, that he had already done, and about which he submitted his written report of January 31, 2006.
Upon completion by Mr. Van Derostyne and Mr. Peters of their investigations, two reports were written. First was Mr. Van Derostyne’s report, dated August 13, 2006. Next was Mr. Peters’ report, dated September 29, 2006, more than six months after Mr. Vanderbrook’s report of January 31, 2006, and more than one year after Mr. Jaeger had submitted his J.R.A. property claim and proof of loss to Essex.
As a beginning point of their investigations, Mr. Peters made a Pre-Katrina, “Actual Cash Value” appraisal of both properties, in which he valued 1928 West End Park at $2,314,747, and 1904 West End Park at $467,489.69.
Mr. Van Derostyne’s report, which (as argued by J.R.A.) relied on “extreme circumstantial evidence,” and purportedly blamed Katrina’s wind forces (the covered peril in Essex’s Policy) as the cause of only a portion of damages, before flooding and storm surges (excluded perils in Essex’s policy) caused the remaining losses, by washing away whatever remained. For 1928 West End Park, he estimated the wind damage to have been $467,489.50, and for 1904 West End Park, he estimated the wind damage to have been $8,671.42. In addition, Mr. Van Derostyne’s report first established a “time line” of wind and flood surge reports gathered from various meteorological sources. From that point, he estimated that wind forces only had caused piece by piece destruction of component parts and bits of each building, before flood surges arrived at approximately 9:15 a.m., and washed away whatever remained.
|41Thus, by using the coinsurance methodology required by Essex’s policy, and applying it to what Mr. Peters had estimated the wind damage to 1928 West End Park to have been, $467,489.60, Essex would owe only $108,000, even though the policy limits were $600,000. And, for Mr. Peters’ estimate for 1904 West End Park wind damage ($85,761.41), Essex would owe J.R.A., only $18,431.84, even though the policy limits were $100,000.
J.R.A. argues that if property is under-insured, the insurer must still be fair, act in good faith, and comply with its policy obligations. Further, J.R.A. argues that underinsured property does not permit the insurer to delay payment of its insured’s just entitlements, until it is able to obtain *886 an adjustment report which is in its best interest, and to the detriment of its insured. And, that by their very nature, the reports of Mr. Van Derostyne and Mr. Peters were based on evidence which is entirely circumstantial. Thus, under Louisiana jurisprudence, such evidence cannot serve to satisfy the burden of proof of Essex to establish that when taken as a whole, it constitutes clear and convincing proof of what happened, and precludes every other reasonable explanation of what happened,[16] Finally, that the aforementioned actions by Essex prove that it, as an insurance company, sought to avoid payment to its insured, after its first adjuster conducted an investigation which is favorable to the insured, by then seeking, and obtaining, another investigation and report which favors the insurance company, to the detriment of its insured, with no firm, reliable supporting evidence, and based entirely on the weakest possible circumstantial evidence.
In response to the cross appeal, Essex argues that there was no testimony nor other evidence that Essex ignored Mr. Vanderbrook’s report. To the contrary, |42Essex never rejected any recommendations made by the independent adjuster or engineering experts. Essex unmistakably recognized that Mr. Vanderbrook’s report concluded that the damage was caused by a combination of storm surge and wind but was inconclusive regarding the amount of wind damage. Appropriately, Essex sought a more detailed analysis of the loss from MK & A, including consideration of necessary data to which Mr. Vanderbrook did not have access. Essex argues that MK & A produced a more detailed analysis of the loss, which provided proper guidance to Essex. Thus, Essex argues that the contentions of J.R.A. do not have merit.
Our review of the record suggests that we cannot say that Essex failed to fairly and expeditiously process the claim of J.R.A. Considering that the record does establish that there was some difficulty in obtaining information from Mr. Jae-ger, we find that J.R.A. has not satisfied its burden in establishing that the district court abused its discretion in denying the motion for new trial of J.R.A.

DECREE

For the foregoing reasons, the judgment of the district court as to the appeal of Essex Insurance Company is affirmed. However, while we affirm the judgment of the district court, we grant motion of J.R.A. to amend the judgment so as to only cast J.R.A. in judgment, and remove Mr. Jaeger from the judgment. Furthermore, we remand the matter to the district court for clarification as to the amount of the judgment. Finally, the cross appeal of J.R.A. is affirmed.
MOTION TO AMEND GRANTED; AMENDED; AFFIRMED AS AMENDED; REMANDED; CROSS APPEAL DENIED
ARMSTRONG, C.J., concurs.
TOBIAS, J., concurs and assigns reasons.
BONIN, J., concurs with reasons.

. Effective October 1, 2004.

. CompuWeather is a worldwide company which provides services in the field of forensic meteorology.

. 28 U.S.C. § 1447, entitled Procedure after removal generally, provides in paragraph (c):
A motion to remand the case on the basis of any defect other than lack of subject matter jurisdiction must be made within 30 days after the filing of the notice of removal under section 1446(a). If at any time before final judgment it appears that the district court lacks subject matter jurisdiction, the case shall be remanded. An order remanding the case may require payment of just costs and any actual expenses, including attorney fees, incurred as a result of the removal. A certified copy of the order of remand shall be mailed by the clerk to the clerk of the State court. The State court may thereupon proceed with such case.

. The portion of the district court judgment related to the instant cross appeal is discussed later.

. Renumbered from R.S. 22:658 by Acts 2008, No. 415, § 1, eff. Jan. 1, 2009.

. Act No. 813, effective August 15, 2006, amended by R.S. 22:658(B) by increasing both penalties and attorney’s fees provided therein from twenty-five percent to fifty percent.

. Discussed later in this opinion.

. Essex references 12 Lee R. Russ & Thomas F. Segalla, 7 COUCH ON INSURANCE § 98:17 (3d ed.2006).

. Mr. Carubba was well-acquainted with 1928 West End Park, by having performed, several years before Katrina, a "condition of the building" report, which required him to conduct a personal, hands-on inspection of all parts and phases of the 1928 West End Park building.

. Frught was only considered as a writ application by this Court and the Fourth Circuit writ application appears as an unpublished writ disposition on Westlaw. However, we note that the Landry case was cited in Frught, and we shall discuss the law of Landiy, as relates to the calculation methodology in the instant case.

. Two judges on the panel concurred in the judgment reversing summary judgment in favor of plaintiff, but dissented insofar as the majority granted summary judgment in favor of Lafayette. These judges would have denied summary judgment and remanded the case for trial.

. Essex relies on 12 Lee R. Russ & Thomas F. Segalla, 7 COUCH ON INSURANCE § 175:5 (3d ed.2006).

. J.R.A. adds that should this Court reverse the district court’s denial of penalties and attorney fees, and find that Plaintiffs are entitled to both, it will be necessary to decide whether Plaintiffs are entitled to the fifty (50%) percent penalties and attorney fees provided in the 2006 Amendment, or the twenty-five (25) percent provided.

. The findings of Mr. Vanderbrook are discussed infra, pp. 3-12.

. J.R.A. argues that the report of MK & A, clearly designates Essex's adjuster, Apple Adjusters, as the "intended recipient,” and that Section I thereof declares a disclaimer of reliability.

. See Carter v. City Parish Government of E. Baton Rouqe, 423 So.2d 1080 (La.1982); Brooks v. State Fann Mutual Automobile Ins. Co., 2003-0389 (La.App. 4 Cir. 9/24/03), 855 So.2d 419.